**Eric AVELLAR, Petitioner,**

v.

**Larry E. DUBOIS, Commissioner of Correction.**

No. CIV.A. 97–12841–RGS.

United States District Court, D. Massachusetts.

Dec. 4, 1998.

Eric Avellar, Norfolk, MA, pro se.

Kenneth E. Steinfield, Assistant Attorney General, Boston, MA, for Respondent.

*ADOPTION OF MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION*

STEARNS, District Judge.

I adopt the Magistrate Judge's Recommendation and consequently will order that the Petition for Writ of Habeas Corpus be *DENIED*. I also adopt the Report with the following comments.

■ I believe that Respondent is correct that the recitation of the underlying facts by the Supreme Judicial Court is entitled to a presumption of correctness pursuant to 28 U.S.C. § 2254(e)(1). See *Sumner v. Mata*, 449 U.S. 539, 545–546, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981) (discussing the presumption under predecessor § 2254(d)). It is unlikely that the Antiterrorism and Effective Death Penalty Act of 1996 was intended to diminish the deference traditionally accorded to a state appellate court's determination of the facts. See, e.g., *Biskup v. McCaughtry*, 20 F.3d 245, 248–249 (7th Cir.1994). Deference seems especially appropriate when a state appellate court has given the trial record the type of scrutiny mandated by G.L. c. 278, § 33E. Nonetheless, the issue has no material bearing on the Magistrate Judge's ultimate conclusions, and thus need not be formally decided.

1. Petitioner's trial took place in 1991.

■ A more substantial issue is raised by Respondent's objection that federal review is barred because the state court's decision rests "on a state law ground that is independent of the federal question and adequate to support the judgment." *Lambrix v. Singletary*, 520 U.S. 518, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997), quoting *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The Single Justice's "gatekeeper" decision is a sufficient basis in and of itself to dismiss the petition. See *Burks v. Dubois*, 55 F.3d 712, 716 (1st Cir. 1995). See also *Moore v. Ponte*, 924 F.Supp. 1281, 1295–1296 (D.Mass.1996).

■ Finally, the Magistrate Judge ably analyzed what he correctly determined was an erroneous instruction defining third prong malice to include acts that create a plain and strong likelihood of death *or grievous bodily harm*. I disagree, however, with his conclusion that the question whether the error might require a new trial is "close." First, as the Magistrate Judge recognized, this instruction was not erroneous when given and was modeled on language that can be found in Supreme Judicial Court opinions as late as 1994. See, e.g., *Commonwealth v. Delaney*, 418 Mass. 658, 667, 639 N.E.2d 710 (1994).[1] But see *Commonwealth v. Sires*, 413 Mass. 292, 303–304 n. 14, 596 N.E.2d 1018 (1992). The vice of the instruction is that it confuses third prong malice necessary for murder with the standard defining involuntary manslaughter. See *Commonwealth v. Vizcarrondo*, 427 Mass. 392, 395, 693 N.E.2d 677 (1998). Nonetheless, given the nature of the injury inflicted—a blow to the head of a six-month old infant severe enough to cause a massive skull fracture—no properly instructed juror, as the Magistrate Judge concluded, could perceive the Petitioner's conduct "as presenting something less than a plain and substantial likelihood of death." Report and Recommendation, at 37. The error was therefore harmless. See *Commonwealth v. Murphy*, 426 Mass. 395, 401, 688 N.E.2d 966 (1998); *Commonwealth v. Sanna*, 424 Mass. 92, 105, 674 N.E.2d 1067 (1997). See also *Commonwealth v. Fitzmeyer*, 414 Mass. 540, 547–548, 609 N.E.2d 81 (1993) (where it is

obvious that the risk of harm created is a strong likelihood of death, an instruction on involuntary manslaughter is not required).

### ORDER

The Recommendation of the Magistrate Judge is *ADOPTED*, and the Petition for Writ of Habeas Corpus is *DENIED*.

SO ORDERED.

### REPORT AND RECOMMENDATION REGARDING RESPONDENT'S OPPOSITION TO THE PETITION FOR WRIT OF HABEAS CORPUS (DOCKET NO. 9)

KAROL, United States Magistrate Judge.

On December 6, 1991, a Bristol County Superior Court jury found Petitioner Eric Avellar ("Petitioner"), guilty of the first degree murder, by reason of extreme atrocity or cruelty, of his six-month old son, Shawn. The Supreme. Judicial Court ("SJC") reviewed the conviction pursuant to the special procedures applicable to appeals in capital cases, M.G.L. ch. 278, § 33E ("Section 33E"), and affirmed. *See Commonwealth v. Avellar*, 416 Mass. 409, 622 N.E.2d 625, 632 (Mass.1993). Petitioner then moved for a new trial pursuant to Mass. R.Crim. P. 30(b), alleging, among other things, that his retained appellate counsel had provided ineffective assistance on direct appeal. The Superior Court (Brassard, J.) conducted an evidentiary hearing and, in a comprehensive written opinion, denied the motion. *Commonwealth v. Avellar*, Crim. No. 24485, *Memorandum of Decision and Order on Defendant's Motion for New Trial*, (Mass.Super.Ct. Dec. 16, 1996) (attached as Ex. 8 to Respondent's *Supplemental Answer*, Vol. 3, Docket No. 11) (hereinafter "Brassard Opinion"). Petitioner then sought leave from the Single Justice to appeal to the SJC from the denial of his motion for new trial, but the Single Justice (Lynch, J.) denied leave to appeal because the issues as to which Petitioner sought review were either not new or not substantial, or both. *Commonwealth v. Avellar*, No. 97–0038, *Memorandum and Order* (Mass. June 12,

1997). On December 19, 1997, having exhausted the remedies available to him in state court, Petitioner filed a Petition for Writ of Habeas Corpus (Docket No. 1) in this court. The petition asserts only one ground for relief: ineffective assistance of appellate counsel on direct appeal, based on appellate counsel's failure to press several specific claims of trial error, none of which had been preserved by trial counsel. Pursuant to this court's procedural Order of March 16, 1997 (Docket No. 6), Respondent Larry E. DuBois ("Respondent"), filed a memorandum in opposition to .the Petition, accompanied by a comprehensive three-volume set of supplemental materials related to the various state court proceedings. *See Respondent's Brief in Opposition to the Petition for Habeas Corpus*, Docket No. 9 (hereinafter *"Respondent's Opposition"*); *Supplemental Answer*, Vols. 1–3, Docket No. 11 (hereinafter *"Supplemental Answer*, Vol. n "*). Upon careful consideration of Respondent's Opposition and the supplemental materials that accompanied it, I conclude, for reasons set forth below, that the rejection by the Superior Court of Petitioner's claim that appellate counsel was ineffective was not "contrary to" and did not "involve[ ] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2245(d) (1998) (inserted by Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (1996) ("AEDPA"); *see O'Brien v. Dubois*, 145 F.3d 16, 25 .(1st Cir.1998) ("for the writ to issue, the state court decision must be so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes."). Accordingly, I recommend that the petition be DENIED.

### I. BACKGROUND AND PRIOR PROCEEDINGS [1]

#### A. Conviction and Direct Appeal

Petitioner's six-month old son, Shawn, died on October 6, 1989. The cause of death, as revealed by autopsy, was a massive skull

---

**1.** Unless otherwise noted, facts set forth in this section are undisputed.

fracture. On December 6, 1991, following a trial at which Petitioner, upon advice of counsel, did not testify, a jury convicted Petitioner of Shawn's murder in the first degree, by reason of extreme atrocity or cruelty. *Avellar*, 622 N.E.2d at 626. The judge immediately sentenced Petitioner to life imprisonment without the possibility of parole. Following the verdict, Petitioner retained as appellate counsel Wendy Sibbison, an experienced attorney who specializes in the representation of defendants in criminal appeals in state and federal courts. In due course, Attorney Sibbison filed a 106–page brief with the SJC in which she assigned a number of errors requiring reversal of the conviction or a new trial. Among other things, Petitioner challenged the sufficiency of the evidence to support the verdict. Petitioner's Brief before the SJC on Direct Appeal, attached as Ex. 4(p) to *Supplemental Answer*, Vol. 2, at 29–53. In the course of affirming the conviction, the SJC summarized the evidence most favorable to the verdict as follows: [2]

Laura Courtney ["Courtney"] became involved in an affair with defendant in July, 1988. Both were married but separated from their spouses. After Courtney became pregnant, the defendant told her he wanted her to abort the baby, explaining, among other things, that his divorce was not yet final and he was already paying support for his son. Courtney did not have an abortion, and for the remainder of her pregnancy saw little of the defendant. The baby, Shawn, was born April 11, 1989. Several weeks later, following Courtney's request, the defendant went to Courtney's house to see Shawn. A few weeks later the defendant again visited Shawn and then visited him "a couple times a month" during the next several months. The defendant babysat for Shawn three or four times. After one such occasion, Shawn had "a little mark on the side of his eye."

The defendant explained that Shawn had rolled off the couch.

Shawn's pediatrician testified that, during three routine office visits, the child's physical examinations were normal, with proper growth and development. The doctor never detected any injuries or bruises on the child. In addition to the routine visits, the doctor also consulted once by telephone with Courtney in late August, when he prescribed over-the-counter medication for an upper respiratory infection.

Shawn was pronounced dead at the hospital October 6, 1989, at 7:23 A.M. Shawn had spent much of the previous day, October 5, with Courtney and her neighbor, Lori Cote at Cote's apartment. Shawn appeared to be a happy baby that day. "He smiled, laughed." He was getting over a cold. Beginning at 4:30 P.M., Cote's brother and his girlfriend, Amie Fontaine, babysat Shawn while Courtney and Cote purchased beer at a package store. After their return, Courtney fed Shawn at 6:30 P.M., and then Courtney and Cote went to visit Courtney's cousin, Paul, while Fontaine babysat for Shawn as he slept. While at Paul's house, Courtney telephoned the defendant and, as a result, the defendant came to Paul's house. Shortly thereafter, Courtney and the defendant returned to Courtney's apartment, which Courtney then left to go to Cote's apartment to retrieve Shawn. It was then about 9 P.M. Shawn was sleeping at Cote's apartment and Courtney woke him up. She did not have "any problems" waking him up and he smiled at her. Fontaine testified that she did not "do anything to [Shawn] that night," and she did not see anyone strike or injure him in any way.

Courtney returned to her apartment with Shawn. The defendant offered to babysit while Courtney and Cote went to a local bar. As Courtney was getting ready to leave, the defendant's friend, Tracey

---

**2.** I provide this summary only as context for the statement of issues and analysis that follow. In his memorandum, Respondent, citing 28 U.S.C. § 2254(e)(1), asserts that the facts set forth in the SJC's opinion "must in this habeas proceeding be presumed to be correct in the absence of rebuttal by clear and convincing evidence." *Respondent's Opposition*, at 8 n. 8. This is incorrect.

Section 2254(e)(1) applies only to "a determination of a factual issue made by a State court," not to a recitation by a state court of evidence most favorable to a determination of a factual issue by a jury. Therefore, the analysis on which I base my recommendation does *not* assume that the recited facts are correct, presumptively or otherwise.

Payne, came to visit the defendant. Payne testified that he was at Courtney's apartment for about one-half hour with the defendant and Shawn and that Courtney was there part of the time. Payne remembered Shawn being put to bed before Courtney left, but he did not remember who did that. He was sure that Shawn was not on the couch when Courtney left. Payne did not touch Shawn.

At 11:30 P.M., October 5, Courtney called the defendant to check on Shawn. The defendant told her that Shawn "fell off the couch, but he's all right" and he "put him to bed." When Courtney returned home at 12:30 A.M., October 6, the defendant was asleep on the couch. She checked on the baby from the doorway of his room and woke up the defendant. After she and the defendant went to bed together, she wanted to discuss their relationship. As the defendant did not want to have this discussion, he fell asleep. She then got out of bed and went to the kitchen, where she wrote him a love note.

The alarm awoke them at 5:30 A.M., and the defendant arose, without speaking, ten or fifteen minutes later. Courtney heard him say to Shawn, "I have to change your diaper, and you have to go to the doctor's." She then heard Shawn make a "weird noise," as if gasping for air. The apartment was quiet for the next fifteen minutes or so. According to Courtney, the defendant left for work at approximately 6:45 A.M. When the defendant left, Courtney got out of bed and observed the defendant leaving the building.

She then went to check on Shawn, who appeared to be sleeping. After he did not respond to his name, she touched his hands, which were cold. When she picked him up, Shawn was limp, had half-closed eyes, and appeared not to be breathing. She brought him into the living room, set him on the couch, dialed 911, and attempted to resuscitate him. When the rescue team arrived, Courtney was hysterical. The emergency medical technician noted that Shawn had a pulse but appeared in respiratory distress. While being transported to the hospital, Shawn stopped breathing, and then his heart stopped. The

hospital's efforts at resuscitation were unsuccessful, and Shawn was pronounced dead at 7:23 A.M. Dr. Korn, the emergency room physician who first examined Shawn, found a bulging fontanel (the soft spot on a baby's head) and several bruises on the face and hands. He also observed several retinal hemorrhages in back of Shawn's eyes that were bright red, implying that the injury to the head was "relatively new." His initial diagnosis was "child abuse and death due to head trauma."

Dr. John C. DuVally performed an autopsy and concluded that the cause of Shawn's death was a "[m]assive skull fracture with bleeding due to head trauma." Dr. DuVally explained that death likely occurred when the injured brain expanded and pushed down on the brain stem. His examination of Shawn further revealed several faint superficial bruises on his head, chest, and back; a ruptured frenulum (the web of skin between the upper lip and the upper gum); three fractured ribs; and blood in the pleural and abdominal cavities. He was unable to form an opinion as to the amount or nature of the force necessary to cause the fracture, but he concluded that the injuries were not consistent with "shaken baby syndrome" or a fall from a two or three foot couch.

Of critical importance to our conclusion that the evidence warranted a finding that the defendant inflicted the injuries that resulted in Shawn's death is Dr. DuVally's testimony concerning the period with which, in his opinion, the injuries occurred. He testified that, as part of the autopsy procedure, "sections are taken of a number of the bruises that [he had] described; also, what amounts to routine sections. They're called the heart, lung, spleen, kidneys, adrenal, and so forth. The sections of the bruises were very recent. There was hemorrhage into the fat. [He could not] date them or time them exactly, but [he] would say certainly less than twelve hours." Dr. DuVally also characterized various other hemorrhages as "very recent" and when asked whether he could "give an outside time as to the length of

the process" by which the massive skull fracture would have resulted in Shawn's death, he answered, "I'd say less than twelve hours is the best I could do, and again, these are estimates." In response to the question, "would that be twelve hours from the injury to the time of death," Dr. DuVally said, "Yes. Anywhere within ... twelve hours. It could be much shorter."

Finally, the following questions addressed to Courtney, and her answers, are important:

Q.: "Now, at any time during ... that night or early that morning, October 5, October 6, did you strike your baby, Shawn."

A.: "No."

Q.: "Did you hit the baby at all."

A.: "No."

Q.: "During the time that you were with the baby the previous day or that morning did you see the baby fall in any way?"

A.: "No."

Based on the evidence recited above, the jury could have believed that the injuries leading to Shawn's death were inflicted within a period of twelve hours before 7:23 A.M. on October 6, 1989, a period during which only Fontaine, Payne, Courtney, and the defendant had access to Shawn. They also could have believed Fontaine, Payne, and Courtney's testimony that they did not hit or "do anything" to Shawn. From those facts based on direct evidence, the jury would have been warranted in inferring beyond a reasonable doubt that the fatal injuries were inflicted by the defendant when he was alone with Shawn, that is, between 10 P.M. on October 5, and 12:30 A.M. on October 6 or thereafter when he, Courtney and Shawn were together....

*Avellar,* 622 N.E.2d at 626–629.

Attorney Sibbison raised a number of other issues on appeal, in addition to challenging the sufficiency of the evidence to support the verdict. The SJC's resolution of at least three of those other issues has some relevance to the issues before this court. First, she argued that the trial court committed reversible error in failing to instruct the jury that Petitioner could not be convicted solely on the basis of evidence of consciousness of guilt and, further, that the jury was not required to give any weight to such evidence. Two years after Petitioner's conviction, the SJC had held in *Commonwealth v. Cruz,* 416 Mass. 27, 616 N.E.2d 804, 805–06 (Mass. 1993), that the trial judge was required to give just such an instruction whenever consciousness of guilt evidence was admitted, even if, as in Petitioner's case, defendant failed to request the instruction. But, at least in appeals subject to the special procedures set forth in Section 33E, where the defendant failed to request the instruction and the court did not give it *sua sponte,* the error was to be tested "on the standard whether [it created] a substantial likelihood of a miscarriage of justice." *Cruz,* 616 N.E.2d at 806. In order to apply that standard to Petitioner's conviction, the SJC was required to and did review and assess the strength of the other evidence against Petitioner. It characterized such other evidence as "reasonably strong," and, primarily on that basis, concluded that it was "extremely unlikely" that the jury convicted Petitioner solely on the basis of the consciousness of guilt evidence or the mistaken belief that it was required to give some weight to such evidence. *Avellar,* 622 N.E.2d at 632. Thus, despite the fact that the trial court's failure to give the required instruction concerning consciousness of guilt was unquestionably erroneous, the SJC rejected Petitioner's argument that the error was cause for reversal of the conviction or a new trial. *Id.*

Second, Attorney Sibbison argued that it was reversible error for the trial court to have instructed the jury on "the so-called first prong malice aforethought element of murder, that is, proof that the defendant intended to kill the victim." *Id.* The basis for the argument was the undisputed fact that the Commonwealth had offered no evidence that Petitioner actually intended to kill his son. There was no dispute on appeal that the charge was erroneous, but, because no objection had been made to it at trial, the SJC again reviewed the error under the standard of whether it created a "substantial likelihood of a miscarriage of justice." *Id.*

For two reasons, the SJC found no such likelihood. First, the court considered it far more likely that the conviction was based on so-called "second or third prong malice, of which there had been considerable evidence," rather than on juror confusion spawned by the extraneous instruction regarding first prong malice.[3] The other reason the court rejected Petitioner's argument was that "the identity of the assailant, not malice, was the principal issue in contention at the trial." *Id.*

The third argument by appellate counsel with any bearing on the issues raised by the instant Petition was that the "evidence was insufficient to support the jury's verdict of murder committed with extreme atrocity or cruelty." *Id.* Once again, since this claimed error had not been preserved at trial, the SJC reviewed it under the "likelihood of a substantial miscarriage of justice" standard, and, once again, the court concluded that this demanding standard had not been met. The court stated: "In view of the number and severity of the six month old victim's injuries, culminating in death after the passage of an uncertain but appreciable period of time, we cannot conclude that the jury's determination of extreme atrocity or cruelty was unjustified by the evidence." *Id.*

Following its rejection of each of the specific issues Petitioner had pressed on direct appeal, the SJC confirmed that it had discharged its statutory obligation under Section 33E to "review[ ] the entire record" and, having done so, that it had found no basis on which to disturb the verdict. *Avellar,* 622 N.E.2d at 632. The court's explicit reference to Section 33E is significant. Under that provision, entry in the SJC of an appeal from a conviction of first degree murder results in the "transfer to that court [of] the whole case for its consideration of the law and the evidence." M.G.L. ch. 278, § 33E. This is an extraordinarily broad standard of review. *See, e.g., Trigones v. Attorney General,* 420 Mass. 859, 652 N.E.2d 893, 895 (Mass.1995) (capital defendants "receive extremely broad plenary review" under Section 33E); *Commonwealth v. Angiulo,* 415 Mass. 502, 615

N.E.2d 155, 160–61 (Mass.1993) (scope of review under Section 33E is "considerably broader" than that available to defendant in a non-capital case; it is a "uniquely thorough" standard).

Thus, Section 33E has been interpreted and applied to permit—indeed, to require—the SJC to undertake an independent review of the entire record for all manner of error, including error that appellate counsel failed to press and that trial counsel failed to preserve. *See, e.g., Commonwealth v. Callahan,* 380 Mass. 821, 406 N.E.2d 385, 386 (Mass.1980) ("We find no error in any of the points raised by the defendant. However, in accordance with our duty to review the record independently, we find error [in the instruction regarding malice] which requires the granting of a new trial. . . ."); *see also Commonwealth v. Pierce,* 419 Mass. 28, 642 N.E.2d 579, 584 (Mass.1994) (although capital defendant did not challenge on appeal trial court's erroneous instruction that second prong malice includes "all intention to inflict injury," SJC reviewed pursuant to its "duty under G.L. ch. 278, § 33E" and concluded that error did not create a substantial likelihood of a miscarriage of justice); *Commonwealth v. Repoza,* 382 Mass. 119, 414 N.E.2d 591, 599 (Mass.1980) (same, where counsel failed to object at trial or challenge on appeal jury instruction that a "presumption" of malice arose from defendant's use of a deadly weapon in a homicide). Of course, it would be unrealistic to assume that the SJC, *sua sponte,* will spot every conceivable issue in every capital case, but it would also be a mistake to assume that any particular issue in such a case, especially an error in the charge egregious enough to create a substantial likelihood of a miscarriage of justice, would escape review just because appellate counsel did not brief or argue it.

### B. Motion for New Trial and Leave to Appeal

In August 1996, new counsel for Petitioner filed in the Bristol County Superior Court a motion for new trial pursuant to Mass.

---

**3.** Second prong malice is malice based upon an intent to cause grievous bodily harm and is not, directly at least, the subject on the instant Petition. Third prong malice and the court's instructions concerning it are a focus of the Petition and are considered below. *See infra* pp. 30–41.

R.Crim. P. 30(b). The motion raised a number of issues, including ineffective assistance of appellate counsel in regard to her failure to press on direct appeal a number of purported trial errors. None of the purported errors had been preserved by trial counsel. Included among the grounds for appeal purportedly overlooked by appellate counsel were all the issues that are the subject of the present Petition, as well as others that Petitioner does not press here. Since the trial judge had retired, the motion for new trial was assigned to Judge Brassard.

Judge Brassard held an evidentiary hearing on November 8, 1996. On December 16, 1996, he issued a comprehensive written opinion denying the motion, which opinion considered and rejected on the merits all claims of ineffective assistance of appellate counsel. Brassard Opinion, at 21. At the same time, Judge Brassard expressly declined to exercise his discretion to revive and consider on the merits the unpreserved trial errors that purportedly underlay such claims of ineffective appellate assistance. *Id.* at 20–21. Judge Brassard's reasons for rejecting each claim of ineffective appellate assistance and my reasons for concluding that Judge Brassard's decision was very comfortably within "the universe of plausible, credible outcomes," *see O'Brien*, 145 F.3d at 25, are discussed below.

Petitioner then sought leave to appeal to the SJC from the denial of his motion for new trial. Under Section 33E, no such appeal will lie "unless the appeal is allowed by a single justice of the supreme judicial court on the ground that it presents a new and substantial question which ought to be determined by the full court." M.G.L. ch. 278 § 33E. On or about April 4, 1997, Petitioner's counsel filed with the Single Justice a 67–page petition requesting such leave, of which a 39–page section was devoted to the claims of ineffective appellate assistance. Ex. 9 attached to *Supplemental Answer*, Vol. 3, at 8–37. On June 12, 1997, the Single Justice (Lynch, J.), who had been a member of the panel that originally heard and decided Petitioner's direct appeal, issued a Memorandum and Order denying the petition for leave to appeal. Ex. 11 attached to *Supplemental*

*Answer*, Vol. 3. Concerning the issues now being pressed here, the Memorandum and Order stated: "[T]he motion judge carefully and properly disposed of the defendant's arguments asserting ineffectiveness of appellate counsel as not being new or substantial or both. For substantially the same reasons the defendant's petition for leave to appeal to the full court is denied." *Id.* This set the stage for the filing of this Petition, on or about December 19, 1997.

## II. *PARTICULAR GROUNDS ASSERTED FOR RELIEF*

In broad outline, Petitioner contends that appellate counsel's performance was deficient in three respects: (1) failure to argue that a series of rhetorical questions by the prosecutor during closing argument constituted impermissible comment on the exercise by Petitioner of his constitutional right not to testify; (2) failure to argue that the judge's instructions regarding Petitioner's right not to testify were "so equivocal and confusing" as to deprive Petitioner of his rights under the Fifth Amendment; and (3) failure to argue that the judge's instructions regarding the elements of the offense for which Petitioner was convicted (first degree murder by reason of extreme atrocity or cruelty) were erroneous in that they misdefined third prong malice; misdefined criminal intent; mistakenly equated malice with wrongful motive; and expanded the definition of "extreme atrocity and cruelty" beyond the narrow limits established by the SJC in prior cases. Addendum to Petition, Docket No. 1, at 1–3 (hereinafter "Addendum").

Turning to the particulars, Petitioner first argues that appellate counsel should have protested the prosecutor's use of the phrase "we don't know" on five separate occasions during closing argument. Each occasion followed a rhetorical question posed by the prosecutor about what in fact happened in the hours preceding Shawn's death. For example, after reminding the jury that only Petitioner "kn[ew] what he did [the] night [of the murder]," the prosecutor argued at one point that it was possible that all Shawn's injuries were inflicted by a single blow, but,

he added, "we don't know." Transcript of Closing Argument, attached as Ex. 4(j) to *Supplemental Answer,* Vol. 2, at 7–112 (hereinafter "Closing Argument"). On another occasion, the prosecutor speculated about whether Petitioner had lost his temper as a result of a telephone call he received while he was babysitting for Shawn:

> Did it set him off? What kind of a temper does he have? *We don't know.* We know about his attitude in general towards that child. Did the baby wake up crying? Was the baby already awake? Was it crying? Did one thing pile on another and then bang, bang, bang? *We don't know.* But I suggest to you, for whatever reason, whatever probably insignificant reason, the only conclusion you can come to is that he did it.

*Id.* at 7–113 (emphasis supplied). Petitioner argues that the prosecutor's argument was not simply an impermissible comment on his failure to testify, in violation of *Griffin v. California,* 380 U.S. 609, 613, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), and its progeny, *see, e.g., United States v. Sepulveda,* 15 F.3d 1161, 1187 (1st Cir.1993) (stating test as whether "the language used [by the prosecutor] was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify"), but that it created a substantial likelihood of a miscarriage of justice. Therefore, according to Petitioner, appellate counsel should have raised this issue on direct appeal. *Addendum,* at 1–2.

Second, Petitioner argues that appellate counsel should have challenged as "equivocal and confusing" the judge's instructions concerning the fact that Petitioner did not testify at trial. *Id.* at 2. The first time the subject came up, the judge had just finished explaining to the jury what inferences were and how they might permissibly be used in a criminal trial. He then qualified his explanation as follows:

> You cannot in any way use the absence of any testimony from the defendant to draw any inferences. If you think you need his testimony to draw or not draw any inferences, you cannot make such an inference.

But the jury may, however, properly draw inferences which are not too remote in the ordinary course of events and conclude, upon all of the circumstances and the warranted inferences, that the defendant is guilty by evidence beyond a reasonable doubt if you do come to that conclusion. Even though there may not be direct evidence, a jury, in other words, can make inferences, but I caution you that you are not compelled to use any inferences at all if you choose not to do so from the evidence in the case.

Transcript of Jury Charge, attached as Ex. 4(*l*) to *Supplemental Answer,* Vol. 2, at 7:133–34 (hereinafter "Jury Charge"). Petitioner contends that appellate counsel was constitutionally ineffective for failing to argue that this instruction was error (albeit unpreserved), in that it deprived the jury of the right to infer from Petitioner's failure to testify that he was innocent, or, in the alternative, that it permitted the jury to infer guilt from Petitioner's failure to testify if such inference was not "too remote in the course of events." *Addendum,* at 2.

Further on the subject of the "equivocal and confusing" instruction about Petitioner's failure to testify, Petitioner contends that appellate counsel should have challenged the following instruction:

> In connection with this case, members of the jury, the defendant has not testified during the course of this trial, and it's very important for you to keep in mind that he has no obligation at all to testify, and you should draw no inference whatsoever with respect to his conduct for his failure to testify. There is a statute in Massachusetts which says that a defendant in a trial of a criminal case may elect not to testify, and the lack or refusal to testify shall not in any way be used against him. So, I bring to your attention that the defendant in this case need not testify, and no unfavorable inference should be drawn against him for his failure to testify. There is a burden of proof, members of the jury, which I will explain to you in a moment, that is upon the prosecution to prove its case by evidence beyond a reasonable doubt, and that burden remains with the

prosecution throughout the entire trial and never shifts to the defendant unless and until the Commonwealth has proven his guilt by evidence beyond a reasonable doubt. But the defendant is never required to prove that he is innocent, and you should give no significance at all to the fact that he did not testify. He has no obligation to prove anything. Jury Charge, at 7:136–37. Petitioner argues that this instruction was erroneous in at least three respects. First, by telling the jury that it could draw no inference with respect to Petitioner's "conduct" as a result of his failure to testify, the court impliedly authorized the jury to draw negative inferences about Petitioner's intent or state of mind as a result of such failure, or it left open the possibility at least that it could do so. Second, by using the words "failure" or "refusal" in reference to Petitioner's decision to exercise his right not to testify, the court placed a negative gloss on that decision. Third, the court was simply mistaken when it told the jury that the burden shifted to Petitioner to disprove the Commonwealth's case, once the Commonwealth carried its burden of proving guilt beyond a reasonable doubt. The burden never shifts to the defendant in a criminal case. In each instance, Petitioner faults counsel for not pressing these points on direct appeal. *Addendum,* at 2.

The third series of errors that Petitioner says appellate counsel should have argued concerns the trial court's definition of the elements of the offense of conviction—first-degree murder by reason of extreme atrocity or cruelty. Petitioner claims that the court's instructions were defective in four respects:

1. The court instructed the jury that third prong malice includes "an unexcused intent to do an act creating a plain and strong likelihood that death or *grievous bodily harm* would follow," and that such malice "may be inferred if, in the circumstances known to a defendant, a reasonably prudent person would have known that, according to common experience, there was a plain and strong likelihood that death or *grievous bodily harm* would follow from any act . . . of the defendant." Jury Charge, at 7:144–45. In fact, as Petitioner correctly argues, third

prong malice includes only circumstances where the defendant's act creates a plain and strong likelihood of death, not where it merely creates a plain and strong likelihood of grievous bodily harm. *Commonwealth v. Vizcarrondo,* 427 Mass. 392, 693 N.E.2d 677, 680–81 (Mass.1998).

2. The court defined "general intent" as "reflex intent," or something "you don't think about," such as "going up stairs," Jury Charge, at 7–145, instead of making it clear that the general intent required to support third prong malice was a criminal intent, sometimes defined as a "blameworthy condition of the mind." *See, e.g., Commonwealth v. Sibinich,* 33 Mass.App.Ct. 246, 598 N.E.2d 673, 675, nn.1–2 (Mass.App.Ct.1992).

3. The court equated the "malice aforethought" element of the crime of murder with certain types of wrongful motive. Specifically, the court instructed the jury (as was apparently not unusual when this case was tried) that "malice aforethought" exists if the defendant acted with a "frame of mind which includes not only anger, hatred, revenge, but also *any other unlawful and unjustifiable motive,*" Jury Charge, at 7–143, or, along the same lines, if "death flows from some purposeful, selfish, wrongful motive . . . ." *Id.* at 7–144; *see Commonwealth v. Eagles,* 419 Mass. 825, 648 N.E.2d 410, 417 (Mass.1995) (admonishing trial judges that language of this sort "is not helpful and ought in the future to be omitted;" henceforth, "malice should be defined by reference to the three prongs described in *Commonwealth v. Grey,* 399 Mass. 469, 505 N.E.2d 171, 174 n. 1 (Mass.1987))."

4. Finally, contrary to dictum in *Commonwealth v. Hunter,* 416 Mass. 831, 626 N.E.2d 873, 877 (Mass.1994), the court charged the jury that it could find that Shawn's murder was committed with "extreme atrocity or cruelty" whether or not any of the specific factors set forth for consideration in *Commonwealth v. Cunneen,* 389 Mass. 216, 449 N.E.2d 658, 665 (Mass.1983), were present. *Cf. Commonwealth v. Semedo,* 422 Mass. 716, 665 N.E.2d 638, 645 (Mass.1996) ("We conclude that *Hunter* is not retroactive.")

In each instance, Petitioner maintains that appellate counsel was constitutionally ineffective for failing to present these unpreserved errors to the SJC for consideration on direct appeal.

## III. THE LEGAL FRAMEWORK

### A. Ineffective Assistance of Appellate Counsel

█ The Supreme Court held in *Evitts v. Lucey* that the Due Process Clause of the United States Constitution guarantees defendants the right to receive effective assistance of counsel on their first appeals of right from state court convictions. 469 U.S. 387, 396, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). It derived this principle from the convergence of two prior lines of cases. The first had held that defendants have a right to counsel on first appeals as of right, *see Douglas v. California*, 372 U.S. 353, 355, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963), and the second had held that constitutionally ineffective counsel at the trial level is tantamount to no counsel at all. *See, e.g., Cuyler v. Sullivan*, 446 U.S. 335, 344, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *McMann v. Richardson*, 397 U.S. 759, 771 & n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). To say that a defendant has a right to the effective assistance of counsel, however, is not to prescribe any specific test for determining whether such right has been violated. The Court first addressed this latter issue in the context of a challenge to the effectiveness of *trial* counsel in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). There, the Court established a two-part test that includes a performance component and a prejudice component. With respect to the performance prong, a defendant seeking a new trial based on a claim of ineffective assistance of trial counsel must show that counsel's performance "fell below an objective standard of reasonableness." 466 U.S. at 687–88, 104 S.Ct. 2052. This is a difficult standard to satisfy, because there exists a "strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. 2052. The second prong of the *Strickland* test is a requirement that the defendant "affirmatively prove prejudice." *Id.* at 693, 104 S.Ct. 2052. Prejudice in this context means "that there [was] a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. The term "reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." *Id.*

In *Evitts*, the parties had stipulated that counsel's performance was ineffective and that, as a result of counsel's ineffective performance, defendant's appeal had been dismissed on a procedural technicality. Because of this stipulation, there was no need for the Court to prescribe a test for evaluating claims of ineffective assistance of appellate counsel. Thus, although it acknowledged the *Strickland* standard as controlling in the trial context, it eschewed any attempt to "decide the content of appropriate standards for judging claims of ineffective assistance of appellate counsel." *Evitts*, 469 U.S. at 392, 105 S.Ct. 830. To date, the Court has not revisited this issue.

Lower courts that have considered it assume that the same standards that govern claims of ineffective assistance of trial counsel apply to claims of ineffective assistance of appellate counsel. *E.g., United States v. Ortiz*, 136 F.3d 161, 166, 167 (D.C.Cir.1998); *McCleese v. United States*, 75 F.3d 1174, 1179 (7th Cir.1996). The parties in the present case make the same assumption. *Respondent's Opposition*, at 14–15; Defendant's Petition For Leave to Appeal Superior Court's Denial of Motion for New Trial, attached as Ex. 9 to *Supplemental Answer*, Vol. 3, at 10 n.8.[4] In the absence of any

---

4. Petitioner argued in state court that the standard for evaluating the effectiveness of counsel under Massachusetts law is at least as demanding as the federal standard, as articulated in *Strickland*. Defendant's Petition for Leave, at 10. This is in accord with Massachusetts precedent. *Commonwealth v. Licata*, 412 Mass. 654, 591 N.E.2d 672, 676 & n. 10 (Mass.1992). Judge Brassard made this same point in his Memorandum of Decision, in explaining why it was unnecessary for him to consider separately the question whether appellate counsel's performance was deficient under applicable federal standards. Brassard Opinion, at 9–10 ("I analyze this question only under the Massachusetts Constitution and not under federal law because 'if the *Saferi-*

dispute on this point, I too shall assume that, to obtain relief, Petitioner must carry the heavy burden of showing that counsel's performance was outside the range of reasonable professional assistance and that, had appellate counsel's performance been minimally adequate, there is a reasonable probability that the outcome of the appeal would have been different.[5] As we are about to see, however, even this statement of the issue, favorable though it is to Respondent, significantly understates Petitioner's burden.

## B. The AEDPA Standard of Review

As difficult as Petitioner's task might otherwise have been, the AEDPA presents Petitioner with another formidable set of obstacles. AEDPA amended 28 U.S.C. § 2254(d) so that the statute now reads, in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Feder-

al law, as determined by the Supreme Court of the United States; . . .

28 U.S.C. § 2254(d)(1).

■ Thus, in a case like this, in which the claim Petitioner attempts to assert in his habeas petition was considered and decided on the merits by a state court (Brassard, J.), a federal court must give a certain degree of deference to the state court's decision.[6] The amount of deference that must be given was the subject of *O'Brien v. Dubois*, 145 F.3d 16 (1st Cir.1998). The underlying trial issue presented in *O'Brien* involved the application of the Constitution's Confrontation Clause to a particular set of facts. Petitioner's claim there was that the trial judge had unconstitutionally deprived him of his right to conduct recross examination concerning a new matter that had first surfaced during the government's redirect examination of a key witness. In a 4–3 decision, the SJC had rejected this argument and affirmed the conviction. Before it could address this underlying trial issue on habeas review, the First Circuit first had to interpret and formulate the ground rules for the application of the AEDPA's "contrary to" and "unreasonable application of" clauses. After considering and rejecting several alternatives, it prescribed the following two-stage review process:

---

*an* test is met, the Federal test is necessarily met as well.' ") (quoting *Licata*, 591 N.E.2d at 676 n. 10). Neither party questions this premise, and I see no need to do so either. Therefore, although Judge Brassard did not explicitly analyze Petitioner's claims pursuant to the *Strickland* standard, I shall assume that his reasoning and conclusions would have been the same had he done so.

5. Although I apply this standard here, I note that the Court in *Evitts* affirmed the issuance of the writ *without* requiring defendant to make even a minimal showing that the arguments he would have raised on appeal might have affected its outcome. It may be argued that the practical effect of the Court's approach in *Evitts* was to render unenforceable the rule of appellate practice that defendant's lawyer had so blithely ignored. Be that as it may, *Evitts* is distinguishable in that the defendant there was entirely deprived of his right conferred by state law to appeal at all. Here, Petitioner's appeal was not only decided on the merits, but it was subject to the extraordinarily broad "whole case" standard of review prescribed by Section 33E. Under such circumstances, and because Petitioner does not

argue for a more favorable standard, it seems appropriate to deny relief to Petitioner in the absence of a showing that there was a reasonable probability that the outcome of the appeal would have been different if the omitted arguments had been made.

6. Although the matter is not free from doubt, the decision by the Single Justice denying Petitioner leave to appeal from the denial of his motion for new trial would not appear to be either a decision by a "State court" or an adjudication "on the merits" of Petitioner's claims (and neither party contends otherwise). Also, in determining that Petitioner had raised no new and substantial issue, it is doubtful that the Single Justice purported to decide an issue of federal law. Thus, the decision by the Single Justice is not entitled to deference under 28 U.S.C. § 2254(d)(1). This is *not* to say, however, that the considered views expressed by a source as authoritative as the Single Justice about the merits of Petitioner's motion have no persuasive value in determining whether a reasonable probability exists that the outcome of the direct appeal would have been different if the omitted arguments had been made.

A federal habeas court charged to weigh a state court decision must undertake an independent two-step analysis of that decision. First, the habeas court asks whether the Supreme Court has prescribed a rule that governs the petitioner's claim. If so, the habeas court gauges whether the state court decision is "contrary to" the governing rule. In the absence of a governing rule, the "contrary to" clause drops from the equation and the habeas court takes the second step. At this stage, the habeas court determines whether the state court's use of (or failure to use) existing law in deciding the petitioner's claim involved an "unreasonable application" of Supreme Court precedent.

*O'Brien*, 145 F.3d at 24. To provide further guidance, it added that "the key inquiry, at bottom, is whether a Supreme Court rule—by virtue of its factual similarity (though not necessarily identicality) or its distillation of general federal law precepts into a channeled mode of analysis specifically intended for application to variant factual situations—can fairly be said to require a particular result in a particular case." *Id.* at 25.

Applying this general framework here, we must first ask whether any Supreme Court decision "require[d] a particular result" with respect to Petitioner's motion for new trial. *See id.* The answer appears to be no. *Evitts* had held only that a constitutional right to effective appellate counsel exists, but it did not purport to give content to that right. Even if we were to look to *Strickland* for such content, as inferior federal courts have done, the Superior Court here properly acknowledged both the existence of such right and of the *Strickland* standard (although it went on to analyze Petitioner's claims in light of what all parties agree are the more stringent Massachusetts standards). In this respect, the state court decision under consideration here is much like the state court decision in *O'Brien* itself. In *O'Brien*, the question was whether there had been a violation of the Confrontation Clause. As the First Circuit observed in *O'Brien*, the Supreme Court had previously characterized the right of a defendant to confront his or her accusers as a bedrock requirement of a fair trial. 145 F.3d at 26. But the state

courts that had originally considered O'Brien's claims, like Judge Brassard here, had not purported to deny the existence or curtail the scope of such right. Rather, they had concluded that the right had not been violated. In assessing whether this latter decision was "contrary to" any Supreme Court precedent, the First Circuit found dispositive the fact that no Supreme Court rule dictated a particular result:

> None of the Court's [Confrontation Clause] pronouncements flesh out its very general treatment of cross-examination rights, either by way of a more refined rule specifically intended for application to variant factual contexts or by way of a fact-specific rule that governs recross-examination. There being no clearly established Supreme Court law to which the SJC's decision is "contrary," we must evaluate the petitioner's claim under the "unreasonable application" clause of section 2254(d)(1).

*Id.* at 26.

■ The same is true here. The Supreme Court did not, in *Evitts* or elsewhere—indeed, not even in *Strickland*—prescribe rules that dictate the outcome of particular cases in which a defendant claims ineffective assistance of trial or appellate counsel. To the extent rules have been formulated, they are necessarily general in scope, to take into account the infinite variety of settings in which questions of applicability may arise. Thus, as in *O'Brien*, it cannot be said that the state court decision here was "contrary to" any Supreme Court rule. Petitioner's claim must therefore be evaluated under § 2254(d)'s "unreasonable application" clause.

■ In determining whether a state court decision involves an "unreasonable application" of existing Supreme Court precedent, the federal habeas court must determine if the state court decision "appears objectively reasonable." *Id.* at 25. This is a very different standard than the pre-AEDPA standard that prevailed when *Strickland* was decided and which prompted the Supreme Court there to admonish federal courts not to give deference to state court determinations of effectiveness. *See* 466 U.S. at 698, 104 S.Ct.

2052 ("a state court conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court to the extent stated by 28 U.S.C. § 2254(d)"). Application of the more deferential AEDPA standard involves a discerning examination of the state court decision, but review is not *de novo*. Rather:

> the "unreasonable application" clause does not empower a habeas court to grant the writ merely because it disagrees with the state court's decision, or because, left to its own devices, it would have reached a different result. Rather, for the writ to issue, the state court decision must be so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes.

*O'Brien*, 145 F.3d at 25.

██ This "outside the universe of plausible, credible outcomes" standard is a demanding one under any circumstance. It is especially so where, as here, (1) the direct appeal was decided pursuant to a standard of review as broad as that prescribed by Section 33E and (2) the habeas petitioner's claim turns not on the application of a black letter rule of law to a set of undisputed facts, but on an inherently imprecise assessment of probabilities about the effect an unpreserved trial error might have had on the outcome of an appeal, had the error been briefed and argued. After all, Section 33E review is of the entire record and is not limited to errors raised by appellate counsel. *See supra* pp. 84–85. This means that the purported error may well have been considered by the SJC on direct appeal, especially if it was serious enough to create a substantial likelihood of a miscarriage of justice. Moreover, the question of whether an error created a substantial likelihood of a miscarriage of justice is essentially a judgment call by the SJC. Putting all

this together, for Petitioner to prevail, he must ride a very large camel through the eye of a very small needle. *See Matthew* 19:24. He must establish that Judge Brassard could not plausibly have rejected his argument that the omitted issues were so subtle that they likely escaped the SJC's searching Section 33E inquiry and yet were so obvious and egregious that (1) appellate counsel's failure to press them was outside the wide range of reasonable professional assistance and (2) had appellate counsel pressed them, they would probably have been deemed in the judgment of the SJC to give rise to a substantial likelihood of a miscarriage of justice. While a case might conceivably arise in which a Superior Court's conclusion in such respect is so arbitrary as to fall "outside the universe of plausible, credible outcomes," such a case will be rare indeed.[7]

## IV. APPLICATION OF STANDARD TO GROUNDS ASSERTED FOR RELIEF

██ As noted, a defendant seeking relief on the ground of ineffective assistance of counsel must show both objectively unreasonable performance and prejudice. Prior to the AEDPA, it was unnecessary for a federal habeas court to address both components if it was clear that one or the other could not be satisfied. *See Strickland*, 466 U.S. at 697, 104 S.Ct. 2052 ("there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one"). Presumably, under the new AEDPA standard, it is unnecessary for the federal habeas court to address both components if the state court had an objectively reasonable basis for concluding that

---

7. For purposes of illustration only, suppose a trial judge inadvertently shifted the burden of proof in a criminal case and instructed the jury that the burden was on defendant to prove innocence beyond a reasonable doubt. If, by some remote chance, neither trial nor appellate counsel noted the error and the SJC also did not pick it up on Section 33E review, it would probably be "outside the universe of plausible, credible outcomes" for a state court judge hearing a mo-

tion for new trial to conclude that, even had appellate counsel argued the point, the conviction would likely have been affirmed. It is self-evident, however, that such an extraordinary confluence of gross errors and oversights by court and counsel at the trial, appellate, and post-trial motion level concerning such an obvious and egregious error will rarely, if ever, occur in the real world.

one or the other could not be satisfied. With one exception, I will therefore consider only Judge Brassard's conclusion that Petitioner suffered no prejudice as the result of Attorney Sibbison's selection of issues. The one exception concerns the only issue which I believe presents a close question: whether Petitioner is entitled to relief for Attorney Sibbison's failure to assign error to the trial judge's erroneous charge concerning third prong malice.[8]

### A. Improper Closing Argument

The first issue Petitioner raises is Attorney Sibbison's failure to challenge the prosecutor's use of the phrase "we don't know" at various places within his closing argument. Petitioner contends this rhetorical device was a veiled and improper reference to his decision not to testify. For this claim to have prevailed on appeal, the SJC would have had to conclude, first, that the jury would naturally and necessarily have taken the prosecutor's use of the phrase "we don't know" to be a comment on Petitioner's failure to testify, e.g., *United States v. Wihbey*, 75 F.3d 761, 769 (1st Cir.1996); *Commonwealth v. Smallwood*, 379 Mass. 878, 401 N.E.2d 802, 810–11 (Mass.1980); second, that the jurors collectively disregarded the trial judge's instruction that they were to draw no adverse inference from such failure; and, third, that there was a substantial likelihood that, but for the jurors' disregard of the instruction, the outcome might have been different.

Judge Brassard considered only the first of these three questions and found no impropriety in the prosecutor's closing argument. Thus, by implication, he found that there was no reasonable likelihood that Attorney Sibbison's failure to challenge the prosecutor's closing affected the outcome of the appeal. Judge Brassard explained his reasoning as follows:

> The prosecutor's remarks, in the context of the entire argument, were presumably directed at bolstering the credibility of Commonwealth witnesses, at highlighting the inferences the jury could make regarding the medical testimony, at drawing attention to the defendant's inconsistent statements, and directing the attention of the jury to the defendant's general attitude towards the victim. There was no error in the prosecutor's argument because a jury would not "naturally and necessarily" construe the comments to be directed to the defendant's decision not to testify.

Brassard Opinion, at 15. Having reviewed the language used by the prosecutor in his closing argument in the context of the issues raised at trial, I cannot say that Judge Brassard's analysis was so implausible as to constitute an unreasonable application of Supreme Court precedent. Indeed, taking into account Petitioner's failure to make a contemporaneous objection at trial, I would, even if I were considering the matter *de novo*, agree with Judge Brassard that "a jury would not 'naturally and necessarily' construe the comments to be directed to the defendant's decision not to testify." *See Sepulveda*, 15 F.3d at 1187 (1st Cir.1993) ("in the absence of a contemporaneous objection it seems fair to give the arguer the benefit of every plausible interpretation of her words"). Therefore, Attorney Sibbison's failure to make this argument did not likely affect the outcome of the appeal and there was no prejudice.[9]

---

8. In fact, in addition to finding that none of the omitted issues likely affected the outcome of the appeal, Judge Brassard also concluded that counsel's performance was not ineffective in any respect. He reasoned that counsel cannot avoid editorial judgments about which issues to include in an appellate brief and that the judgment necessarily exercised by Attorney Sibbison was not unreasonable. He stated:

> The challenge of competent appellate advocacy is not to identify every plausible argument but rather to argue those issues which are most likely to be resolved in favor of one's client.... "Legal contentions, like the currency, depreci-

ate through over-issue." ... " '[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." ... Here, appellate counsel raised seven arguments in her 106-page appellate brief. Appellate counsel's decision not to raise the [omitted issues] did not deprive the defendant of the effective assistance of counsel.

Brassard Opinion, at 19–20.

9. As with this and all the other claims that Petitioner makes, the conclusion that the omitted argument did not affect the outcome of the ap-

### B. Instructions on Fifth Amendment Privilege and Burden of Proof

■ The second issue Petitioner raises is Attorney Sibbison's failure to argue that the trial judge gave erroneous and confusing instructions concerning Petitioner's failure to testify and the Commonwealth's burden of proof. Petitioner challenges these portions of the charge in five particular respects.[10] Judge Brassard reviewed those portions of the charge and concluded that, as a whole, they were not erroneous. Although some aspects of the charge could have been clearer, Judge Brassard's conclusion was well within the universe of plausible outcomes. I will consider separately each portion to which Petitioner objects.

1. Petitioner argues that it was error to instruct the jury that they could not "draw any inferences" from his failure to testify. Petitioner claims that that instruction deprived the jury of the right to infer from the fact that he did not testify the further fact that he was innocent. *Addendum*, at 2. For at least two reasons, this argument is not persuasive. First, it was clear from the charge as a whole that the trial judge was referring only to *adverse* inferences, not to inferences generally. For example, he immediately went on to say that "the lack or refusal to testify shall not in any way be used against [Petitioner]," and "I bring to your attention that the defendant in this case need not testify, and no unfavorable inference should be drawn against him for his failure to testify." Jury Charge, at 7–137. Second, it is contrary to reason and common sense to suggest that the jury would have inferred that defendant was innocent from the fact that he did not testify. When a defendant fails to avail himself of the opportunity to clear his name, it is far more likely that the

jury will infer that the defendant has something to hide. For both of these reasons, it was reasonable for Judge Brassard to conclude that counsel's failure to make this argument did not likely affect the outcome of the appeal.

■ 2. Petitioner argues that the jury might have been confused when the court instructed it that it "may . . . properly draw inferences which are not too remote in the course of events and conclude, upon all of the circumstances and the warranted inferences, that the defendant is guilty by evidence beyond a reasonable doubt if you do come to that conclusion." In particular, he contends that the jury might have understood this to be a qualification of or an exception to the earlier portion of the charge to the effect that the jury could draw no inference from Petitioner's failure to testify. This is extremely unlikely, especially since, as noted, the court went on to tell the jury on at least two other occasions that no adverse inference could be drawn from defendant's failure to testify. In the context of the charge as a whole, the jury would likely have understood the challenged statement to mean that a conviction need not be based on direct evidence. As such, this portion of the charge was not in error, and it certainly was reasonable for Judge Brassard to conclude that this purported error would not have been perceived by the SJC to have created a substantial likelihood of a miscarriage of justice.

3. Petitioner objects to the judge's statement to the jury that "it's very important for you to keep in mind that [Petitioner] had no obligation at all to testify, and you should draw no inference whatsoever with respect to his conduct for his failure to testify." Petitioner contends that this permitted—indeed, invited—the jury to draw an adverse infer-

---

peal is buttressed by two related facts. First, the SJC, pursuant to Section 33E, did not confine its review on direct appeal to the issues that Attorney Sibbison had raised. Second, a Single Justice who had been a member of the panel that decided the direct appeal later concluded that Petitioner's motion for new trial did not raise issues that were new and substantial. It may be inferred from these facts either that the SJC had not overlooked those issues when it conducted its Section 33E review, or, at a minimum, that one member of the panel would have voted to affirm

in any case. These factors, though arguably extraneous to any substantive analysis of the omitted issues, are nevertheless properly taken into account when the task facing this court and Judge Brassard is to assess the probability that the outcome of the appeal might have been affected if an unpreserved trial error had been briefed and argued.

**10.** Relevant portions of the charge are set forth above at pages 13–14.

ence about intent, as distinguished from conduct. Again, the charge, taken as a whole, belies any such interpretation. The court told the jury clearly and unequivocally that Petitioner's failure to testify "shall not in any way be used against him," and that "no unfavorable inference" could be drawn. The fact that the judge failed to add the phrase "or intent" after the word "conduct" on a single occasion did not give rise to a substantial likelihood of a miscarriage of justice. Accordingly, it was not unreasonable for Judge Brassard to conclude that the SJC would have rejected this argument.

4. Petitioner contends that the judge's use of the words "failure" and "refusal" in reference to his decision not to testify put a negative gloss on that decision. While it might have been preferable for the court to use the phrase "decision not to testify" instead of "failure to testify" or "refusal to testify," the court's language was not so inflammatory or pregnant with negative connotation as to create a substantial likelihood of a miscarriage of justice. Again, therefore, Judge Brassard was warranted in rejecting Petitioner's argument.

■ 5. At one point in the charge, the judge instructed the jury that the burden of proof "remains with the prosecution throughout the entire trial and never shifts to the defendant unless and until the Commonwealth has proven his guilt by evidence beyond a reasonable doubt." Jury Charge, at 7–137. Although it seems reasonably clear that the court's intention was to instruct the jury that the burden *always* remains on the Commonwealth to prove defendant's guilt beyond a reasonable doubt, the phrase "unless and until" did unnecessarily confuse the issue. Nevertheless, for at least two reasons, the error, if there was one, did not create a substantial likelihood of a miscarriage of justice. First, the court at other places made clear that the burden never shifts to defendant. For example, the court stated at one point: "The burden never shifts to him. He is presumed to be innocent, and that presumption continues until the Commonwealth has proven all of the elements of the crime charged against him by evidence beyond a reasonable doubt...." *Id.* at 7–138. At an-

other point the court stated: "The burden is upon the prosecutor. All presumptions of law independent of evidence are in favor of innocence, and every person is presumed to be innocent until he is proved guilty." *Id.* at 7–139. Second, the confusing language, even in isolation, could not have been harmful. After all, once the jury is satisfied that the government has proven guilt beyond a reasonable doubt, it is the jury's sworn obligation to return a verdict of guilty. It is therefore difficult to see how the outcome of the trial could have been affected by the court's statement that the burden remains on the Commonwealth "unless and until" it "has proven ... guilt by evidence beyond a reasonable doubt."

### C. *Jury Charge on First–Degree Murder (by reason of Extreme Atrocity and Cruelty)*

Petitioner's third and final series of claims concerns the portion of the trial judge's charge to the jury in which the trial judge set forth the elements of the offense with which Petitioner was charged.

■ First and foremost, Petitioner contends, with justification, that the trial judge erred when he instructed the jury that so-called "third prong malice" includes "an unexcused intent to do an act creating a plain and strong likelihood that death or *grievous bodily harm* would follow," and that malice "may be inferred if, in the circumstances known to a defendant, a reasonably prudent person would have known that, according to common experience, there was a plain and strong likelihood that death or *grievous bodily harm* would follow from any act ... of the defendant." *Id.* at 144–45. As Petitioner points out, and as discussed further below, a defendant's awareness of the risk of grievous bodily harm, as distinguished from death, is not sufficient to constitute third prong malice. In considering this argument, Judge Brassard did not purport to defend this portion of the charge. Rather, he took note of the way the SJC had disposed of the equally meritorious argument that the trial judge was wrong to charge the jury concerning first prong malice in the absence of any evidence or claim by the prosecution that

Petitioner intended to kill Shawn. Brassard Opinion, at 16–17. The SJC stated that the trial judge's inclusion of an "overly inclusive description of malice in the jury instructions" did not create a substantial likelihood of a miscarriage of justice because "the identity of the assailant, not malice, was the principal issue in contention at the trial." *Avellar*, 622 N.E.2d at 632. Reasoning that the SJC would likely have disposed of Petitioner's third prong malice argument the same way, Judge Brassard concluded that appellate counsel's failure to make such argument did not likely deprive Petitioner of a substantial defense. Brassard Opinion, at 18. In the alternative to his conclusion that Petitioner had suffered no prejudice, he further held that "[a]ppellate counsel's performance constituted effective assistance," taking into account the choices counsel must necessarily make to avoid submitting an overly lengthy brief. *See supra* note 8 and accompanying text.

Judge Brassard's analysis concerning the prejudice prong arguably did not go far enough. After all, it is one thing for a judge to give a substantively accurate, but extraneous, charge and something else to instruct a jury that they may convict based on conduct that does not constitute the charged offense. In the former case, one can reasonably assume that the superfluous charge had no effect on the verdict, for the very reason that a jury would not likely find a defendant guilty of a charged offense that was unsupported by evidence. In the latter case, however, the jury might well convict on the basis of evidence that defendant engaged in conduct that, as a matter of law, does not constitute the offense of conviction. Nevertheless, for the following reasons, Judge Brassard's conclusion, with respect to both the performance prong and the prejudice prong, was not outside the universe of plausible, credible outcomes.

As noted, Petitioner is correct that the judge's charge, at least in light of contemporary standards, was erroneous, in that third prong malice requires a finding that the defendant engaged in conduct which, in light of circumstances known to him or her, would have caused a reasonably prudent person to know that there was a plain and strong likelihood that death, and death alone, would follow. *See Commonwealth v. Vizcarrondo*, 427 Mass. 392, 693 N.E.2d 677, 680 (Mass.1998) ("We reject any suggestion that we have made something less than a plain and strong likelihood of death sufficient for proof of the third prong of malice."), quoting *Commonwealth v. Sires*, 413 Mass. 292, 596 N.E.2d 1018, 1025 n. 14 (Mass.1992). Since *Sires* was decided in July 1992, precedent existed at least as early as the time the appeal was briefed and argued in December 1992 and May 1993, respectively, that would have supported an argument that the charge was erroneous.

■■ To say that precedent exists to support a particular argument, however, is not to say that counsel's failure to make that argument necessarily constitutes performance that falls outside "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. A survey of Massachusetts cases since the mid-1980s dealing with the issue of third prong malice well illustrates the distinction. A convenient starting point is *Commonwealth v. Puleio*, 394 Mass. 101, 474 N.E.2d 1078, 1083 (Mass.1985). There, in the course of affirming a conviction over a claim that the judge had given an erroneous definition of *first* prong malice, the SJC purported to summarize applicable law as follows:

> Malice aforethought includes any unexcused intent to kill [prong 1], to do grievous bodily harm [prong 2], or to do an act creating a plain and strong likelihood that death or *grievous harm* will follow [prong 3]. So, in order to convict a defendant of murder in the first degree, other than felony murder, the Commonwealth must prove that the defendant unjustifiably killed another, and that he intended to kill or to do grievous bodily harm to the victim, or that he intended to do an act creating a plain and strong likelihood that the victim's death or *grievous harm* would follow.

*Puleio*, 474 N.E.2d at 1083 (emphasis supplied) (internal citations omitted). Based on this expansive definition, both court and counsel could reasonably assume that third

prong malice did indeed include a defendant's knowledge that grievous bodily harm short of death was a likely consequence of his or her conduct.

Two years later, in *Commonwealth v. Grey*, 399 Mass. 469, 505 N.E.2d 171, 173 n. 1, the SJC revisited the issue. This time, without acknowledging any change in the law or attempting to reconcile seemingly contrary language in *Puleio*, the court omitted the "grievous bodily harm" language from dictum concerning the definition of third prong malice. It stated:

> Malice aforethought may be shown by proof that the defendant, without justification or excuse, intended to kill the victim or to do the victim grievous bodily harm.... However, proof of such an intent is not required because malice aforethought may be inferred if, in the circumstances known to the defendant, a reasonably prudent person would have known that according to common experience there was a plain and strong likelihood that death would follow the contemplated act.

*Grey*, 505 N.E.2d at 171 n. 3. *Grey* was followed by *Commonwealth v. Sama*, 411 Mass. 293, 582 N.E.2d 498 (Mass.1991), which, coincidentally, was decided the same day the trial judge delivered his charge in the instant case. In *Sama*, the SJC, in successive passages, first quoted the foregoing footnote from *Grey*, and then somewhat inconsistently stated: "In order to establish the third prong of malice in this case, the Commonwealth had the burden of demonstrating that the defendant knew that he was stabbing the victim with a knife and that a reasonably prudent person ... would recognize that such conduct carried with it the risk of death or *serious bodily injury*." *Sama*, 582 N.E.2d at 500 n. 1, 501 (emphasis supplied). This was the somewhat confused state of the law when the trial judge in the present case included in the portion of his charge concerning third prong malice a reference to "grievous bodily harm."

The SJC decided *Sires* only a few months before Attorney Sibbison ·filed her appellate brief in the instant case. One of the issues in *Sires* was whether the evidence warranted an instruction on involuntary manslaughter. The court held that it did not, and, in the course of affirming defendant's conviction of first degree murder, it stated, seemingly unequivocally: "We reject any suggestion that we have made something less than a plain and strong likelihood of death sufficient for proof of the third prong of malice." *Sires*, 596 N.E.2d at 1025 n. 14.

While this language was sufficiently firm and direct to resolve any uncertainty about the matter, two cases decided in 1994 seemed to reopen the question. In those cases, the SJC again stated that a jury could find third prong malice where defendant was aware of circumstances that would cause a reasonably prudent person to recognize the possibility of injury. *See Commonwealth v. Delaney*, 418 Mass. 658, 639 N.E.2d 710, 714 (Mass.1994) ("The jury should have been instructed, too, that with respect to the third prong of malice the question for them to decide was whether, in the circumstances known to the defendant, a reasonably prudent person would have recognized that the defendant's intentional act would create a strong and plain likelihood of death or injury."); *Commonwealth v. Pierce*, 419 Mass. 28, 642 N.E.2d 579, 585 (Mass. 1994) (same).

The *coup de grace* to the notion that knowledge of the potential for grievous bodily harm might suffice to establish third prong malice arguably did not come until May 1998, when the SJC decided *Vizcarrondo*.[11] There, for the first time, the SJC actually reversed a murder conviction on the ground that the charge included "grievous bodily harm" language in the definition of third prong malice. In commenting on re-

---

**11.** As recently as March 1998, or some two months before *Vizcarrondo*, the First Circuit made the following statement concerning the law of third prong malice: "Massachusetts cases establish that malice can be proven in one of three ways: ... (3) showing circumstances in which a reasonably prudent person would have known there was a plain and strong likelihood that death or grievous bodily harm would result." *Sinnott v. Duval*, 139 F.3d 12, 21 (1st Cir.1998). Acknowledging the existence of some uncertainty on the subject, however, the First Circuit then added, in a footnote: "We note that *Grey* and more recent cases leave out the 'grievous bodily harm' alternative in the third prong, ...." *Id.* at 22 n. 5.

cent cases in which it had itself either misstated the law or failed to note error in similarly improper instructions given at the trial level concerning third prong malice, the SJC stated:

On occasion, however, when the definition of the third prong of malice has not been directly at issue, we have included the grievous bodily harm language in our statement of the definition.... On other occasions, in cases challenging jury instructions on other grounds, we did not correct instructions that included the grievous bodily harm language.... These cases are not to be read to suggest that something less than a plain and strong likelihood of death is sufficient for proof of the third prong of malice.

*Vizcarrondo*, 693 N.E.2d at 681.

 While this comment may finally have put to rest any lingering uncertainty on this subject, it was not made until several years after the appeal in the instant case had been briefed and argued. A strong argument could be made, of course, that given the uncertainty in late 1992 and early 1993 concerning the definition of third prong malice, and despite the fact that no conviction had ever been reversed on such ground as of that time, prudent appellate counsel should have raised this issue on appeal. But we are not addressing the matter *de novo*. Rather, we must ask if Judge Brassard's conclusion that "[a]ppellate counsel's performance constituted effective assistance" was so clearly incorrect as to be outside the universe of plausible outcomes. Judge Brassard certainly had a rational basis for his conclusion. He considered the strength of the many arguments that appellate counsel made in her 106–page brief, relative to the strength of the arguments that she omitted. Another judge considering the matter in the first instance might well have ranked the arguments in a different order and, on that basis, have reached a different conclusion regarding the

effectiveness of appellate counsel's assistance. Nevertheless, it cannot be said that Judge Brassard's decision was "so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes." *O'Brien*, 145 F.3d at 25. Therefore, under AEDPA, it cannot be disturbed.[12]

In the alternative, whether or not counsel can be faulted for not making a third prong malice argument, the record, taken as a whole, reasonably supports Judge Brassard's conclusion that the outcome of the appeal would likely have been the same in any event.

As noted, in its 1992 *Sires* opinion, the SJC, concerned about maintaining a bright line distinction between involuntary manslaughter and murder, "reject[ed] any suggestion that ... something less that a plain and strong likelihood of death [is] sufficient for proof of the third prong of malice." 596 N.E.2d at 1025 n. 14. The appeal in the instant case was argued a short time later, while this same concern was no doubt still fresh in the minds of the justices. Pursuant to Section 33E, the court reviewed the entire trial record in the instant case, focusing particularly on the charge as it pertained to the elements of the offense. Upon doing so, it characterized the evidence overall as "reasonably strong," the evidence of second or third prong malice in particular as "considerable," and the injuries suffered by the victim as being severe enough to support a finding of extreme atrocity or cruelty. *Avellar*, 622 N.E.2d at 632. It also rejected a challenge to the giving of an extraneous instruction on first prong malice on the ground that the identity of the assailant, not malice, was the overriding issue at trial. *Id.* On the basis of all these findings, the SJC held that none of the unpreserved trial errors that had been pressed on appeal created a substantial risk of a miscarriage of justice. Taking just these same factors into account, it would have been

---

12. To the extent that Petitioner claims that Attorney Sibbison did not "winnow out" the omitted arguments but instead overlooked them entirely, it must be reemphasized that the standard for assessing the effectiveness of counsel's performance is one of *objective* reasonableness. *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. It there-

fore does not matter *why* counsel omitted certain arguments. No matter *why* the missing arguments went omitted, the important consideration is whether Judge Brassard's determination—that the relatively stronger issues were included—was beyond the universe of plausible outcomes.

reasonable for Judge Brassard to conclude that counsel's failure to press the third prong malice argument did not likely affect the outcome of the appeal. Specifically, Judge Brassard could reasonably have concluded that the issue is not one that would likely have escaped the SJC's attention or, even if somehow it did, that the court would have rejected as wholly implausible the implicit premise of the omitted argument: that a properly instructed jury might have found that a blow to an infant's head that was sharp enough to cause a massive skull fracture would be perceived by a reasonable person as presenting something less than a plain and substantial likelihood of death.

We need not rely just on this reasoning, however, to conclude that Judge Brassard's conclusion was objectively reasonable. We also know that a member of the panel that decided the original appeal, upon full consideration of all the arguments Petitioner asserts here, concluded that none of those issues presented was new and substantial. Furthermore, we know that on three successive occasions between 1995 and 1998, the SJC rejected claims that an error identical to the one asserted here produced a substantial likelihood of a miscarriage of justice. A comparison of those cases to the present one is instructive.

The first case in which the SJC actually held that it was error for a judge to include the "grievous bodily harm" language in his charge concerning third prong malice was *Commonwealth v. Mello*, 420 Mass. 375, 649 N.E.2d 1106 (Mass.1995). In *Mello*, the judge, without objection, had erroneously charged the jury that third prong malice required, *inter alia*, "a probability of causing grievous bodily harm and a plain likelihood of death." The court affirmed convictions for first and second degree murder on the ground that there was "no evidence that would have warranted, on the facts known to the defendant, a finding of a risk of harm less than a strong likelihood of death." *Id.* at 1117. The evidence on which the court relied for this conclusion was that defendant and his companions had constructed a Molotov cocktail and thrown it at a porch of an apartment house that was filled with sleeping oc-

cupants, two of whom died in the resulting fire.

The second case was *Commonwealth v. Fryar*, 425 Mass. 237, 680 N.E.2d 901 (Mass. 1997). There, the SJC affirmed a conviction of second degree murder, notwithstanding that the judge, over the defendant's objection, had included the "grievous bodily harm" language in his charge concerning third prong malice. The court held that the error was harmless (a less forgiving standard than "substantial likelihood of a miscarriage of justice") in light of the fact that the victim had been stabbed in the chest. The court stated:

> The evidence showed that the victim was stabbed in the chest with a knife. This evidence does not warrant a finding of a risk of harm less than a strong likelihood of death.... Thus, the erroneous grievous bodily harm language in the third prong instruction was harmless.

*Fryar*, 680 N.E.2d at 909.

The third case in the series was *Commonwealth v. Murphy*, 426 Mass. 395, 688 N.E.2d 966 (Mass.1998). There, defendant was convicted of murder in the first degree. The victim, defendant's wife, died of stab wounds to the chest and blunt head and neck trauma. The judge erroneously included "grievous bodily harm" language in his charge concerning third prong malice. The SJC, with hardly any discussion, held that the error was harmless, because "the evidence did not warrant a finding of a risk of harm less than a strong likelihood of death." 688 N.E.2d at 971.

It was not until the decision in *Vizcarrondo* that the SJC first reversed a conviction on the ground that the inclusion of "grievous bodily harm" language in a charge gave rise to a substantial likelihood of a miscarriage of justice. The facts in *Vizcarrondo* are arguably closer to the facts here than those in *Mello, Fryar,* or *Murphy*. A ten month old infant in defendant's care died of multiple blunt force trauma that required four or more blows to the body. Her injuries were substantial, including rib and tibia fractures, a lacerated and crushed liver, and internal bleeding. Defendant had given several conflicting statements to the police, including

admitting that he had squeezed and bitten the victim, but he denied responsibility for her death. In reversing defendant's conviction, the court distinguished *Mello, Fryar,* and *Murphy* on the ground that

> here, the evidence could have "warrant[ed] a finding of a risk of harm less than a strong likelihood of death." ... Although the injuries to the baby were severe and ultimately fatal, the injuries were not inflicted in a manner from which malice is ineluctably inferred.... Unlike those cases, the evidence here could be viewed either as tending to prove a strong and plain likelihood of death or as tending to prove conduct that involved a high degree of likelihood that substantial harm will happen to another.

*Vizcarrondo,* 693 N.E.2d at 681.

Recognizing that Judge Brassard did not have the benefit of *Vizcarrondo* when he denied Petitioner's motion for new trial, it can certainly be argued that, given the superficial similarity of the facts of that case and the present one, *Vizcarrondo* is the best indicator of what the SJC would have done had the error been called to its attention.[13] On the other hand, there are two important distinctions. First, in the present case, the infant Shawn died of a massive skull fracture, rather than of blows to the body. Whatever arguments may be made about the probable effect of blows to the body, it is at least questionable whether the striking of an infant's head with sufficient force to shatter its skull presents the prospect of any injury short of death. Second, as the SJC itself noted in its opinion on direct appeal, the

principal issue here, unlike in *Vizcarrondo,* was not malice but the identity of the assailant.[14]

Again, it must be emphasized that the issue before the court is not how it would have decided the issue in the first instance. Rather, it is whether there was a rational basis for Judge Brassard's conclusion, bearing in mind that our task is the inherently conjectural one of assigning a probability to the prospect that a case decided five years ago would have come out differently if a certain error (which could hardly have escaped the court's attention in any event) had been argued. While *Vizcarrondo* certainly makes the question a closer one than it otherwise would have been, it cannot be said that it dictates any particular outcome here. Thus, it was not arbitrary, irrational, or even implausible for Judge Brassard to conclude that the third prong malice argument would not have affected the outcome of the appeal.

Petitioner's three remaining claims of error in the portion of the charge that concerned the elements of the offense are much more easily disposed of.

■■■ 1. Petitioner argues that it was error for the trial judge to equate "general intent," which is necessary for a finding of third prong malice, with "reflex intent." It is difficult to understand Petitioner's argument. As the SJC pointed out in its decision on direct appeal, the issue in the case was the identity of the assailant; it certainly was not whether the assailant struck the blows by accident or as the result of a reflex response

13. Indeed, Petitioner so argues in a letter to the court. Letter from Eric A. Avellar of September 21, 1998, Docket No. 13 ("The defendant's trial lawyer, in the enclosed case, just like my trial lawyer ..., did not object to the error. But the defendant's appellate counsel in the enclosed case, unlike my appellate counsel ... raised this issue on the direct appeal, resulting in the conviction's reversal.").

14. It might also be noted that the decision in *Vizcarrondo* (and, for that matter, the offensive jury charge as well) came years after the SJC had first put trial judges on notice that it was error to include "grievous bodily harm" language in charges concerning third prong malice and had explicitly warned them that "[i]n the appropriate case we might be moved to set aside a verdict

based on [the] erroneous third prong malice instruction at issue here." *Vizcarrondo,* 693 N.E.2d at 679 (citing *Commonwealth v. Fuller,* 421 Mass. 400, 657 N.E.2d 1251, 1258 (Mass. 1995). The error in the jury charge here was made *before* the issue had been squarely confronted and arguably resolved in *Sires,* and years before the SJC had ever explicitly held that it was error to include the "grievous bodily harm" language in the definition of third prong malice. It is reasonable to assume that, in the absence of clear and consistent authority that would unmistakably have put the trial judge on plain notice of his error, the SJC would have been considerably more reluctant here than it was in *Vizcarrondo* to reverse on the basis of an error to which counsel raised *no objection at trial.*

to some stimulus that startled him or her. It is therefore not just implausible, but virtually inconceivable, that the jury would have decided the case differently had they been properly instructed that the assailant, whoever he or she was, had to have had a blameworthy motive when he or she struck Shawn in the head with enough force to shatter his skull. It therefore was certainly objectively reasonable for Judge Brassard to conclude that the SJC would not have found that this error (assuming there was one and that the SJC was not otherwise aware of it) gave rise to a substantial likelihood of a miscarriage of justice.

2. Petitioner next argues that the trial court erred in giving a so-called "frame of mind" definition of malice, in addition to the now standard three-prong definition. Although the SJC held in *Commonwealth v. Eagles* 419 Mass. 825, 648 N.E.2d 410, 417–18 (Mass.1995) that "frame of mind" language is "not helpful and ought in the future to be omitted," *Eagles* has not been applied retroactively. More to the point, even *following Eagles*, the SJC has declined to find a substantial likelihood of a miscarriage of justice where, as here, a "frame of mind" charge was combined with a three-prong definition. *E.g., Commonwealth v. Murphy,* 426 Mass. 395, 688 N.E.2d 966, 970–71 (Mass.1998) ("instructions on malice that include both the three prong definition and an obsolete [frame of mind] definition adequately convey the meaning of malice to the jury"); *see also Commonwealth v. Niland,* 45 Mass.App.Ct. 526, 699 N.E.2d 1236, 1240 (Mass.App.Ct. 1998) (same). Therefore, it was objectively reasonable for Judge Brassard to conclude that the SJC would not have deemed this error to give rise to a substantial likelihood of a miscarriage of justice.

3. Finally, Petitioner contends that it was error for the judge to charge the jury that murder can be by extreme atrocity or cruelty even if none of the so-called *Cunneen* factors is present. *See Commonwealth v. Cunneen,* 389 Mass. 216, 449 N.E.2d 658, 665 (Mass. 1983). The short answer to this argument is that the case on which Petitioner relies for the proposition that the presence of at least one *Cunneen* factor is required, *Common-*

wealth v. Hunter, 416 Mass. 831, 626 N.E.2d 873, 877 (Mass.1994), is not retroactive. *Commonwealth v. Semedo,* 422 Mass. 716, 665 N.E.2d 638, 645 (Mass.1996). Therefore, it was objectively reasonable for Judge Brassard to reject this argument as well.

## V. CONCLUSION AND RECOMMENDATION

For all the foregoing reasons, I recommend that the Petition for Writ of Habeas Corpus be **DENIED**.

## VI. IMPORTANT NOTICE OF RIGHT TO OBJECT AND WAIVER OF RIGHT TO APPEAL FOR FAILURE TO DO SO WITHIN TEN DAYS

The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court **WITHIN 10 DAYS** of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has indicated that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court's order entered pursuant to this Report and Recommendation. *See United States v. Valencia–Copete,* 792 F.2d 4, 5–6 (1st Cir.1986); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega,* 678 F.2d 376, 379 (1st Cir.1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 605 (1st Cir.1980); *see also Thomas v. Arn,* 474 U.S. 140, 148–149, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986).