COMMONWEALTH vs. JOSEPH A. PULEIO.

Essex.  September 10, 1984. — February 25, 1985.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Homicide. Malice. Witness,* Impeachment. *Evidence,* Impeachment of credibility, Spontaneous utterance. *Practice, Criminal,* Instructions to jury.

The judge at the trial of an indictment for murder properly refused to suspend the trial during defense counsel's cross-examination of a nonparty witness so that certified copies of certain criminal convictions of the witness might be obtained in order to impeach his testimony, where counsel had had ample opportunity prior to trial to subpoena court personnel with the appropriate records or to procure the certified copies, but had neglected to do so. [103-104]

At a murder trial, the judge did not abuse his discretion in permitting testimony relating the response received from an inquiry made to the defendant's girl friend at the scene of the shooting asking who had fired the gun, on the theory that the girl friend's response was a spontaneous utterance admissible as an exception to the hearsay rule. [104-105]

At a murder trial, the judge's instructions to the jury, which erroneously failed to define malice, did not create a substantial risk of a miscarriage of justice inasmuch as the error complained of actually placed a heavier burden of proof on the Commonwealth, and the principal issue at trial was not whether a murder had been committed but whether the murder had been committed by the defendant. [105-109] NOLAN, J., with whom LIACOS, J., joined, dissenting.

At a murder trial, the judge's instructions to the jury on transferred intent correctly emphasized the Commonwealth's burden of proving the defendant's intent to injure one person, although another became the victim. [109-110]

The judge at a murder trial did not err in refusing to instruct the jury on voluntary manslaughter, where defense counsel made no request for such an instruction and where there was no evidence to warrant it. [110]

INDICTMENT found and returned in the Superior Court Department on September 22, 1980.

The case was tried before *Hiller B. Zobel,* J.

*Bernard Grossberg* for the defendant.

*Dyanne Klein Polatin*, Assistant District Attorney, for the Commonwealth.

O'CONNOR, J. After a jury trial, the defendant was convicted of murder in the first degree and was sentenced to life imprisonment. The defendant alleges five errors. He argues that the trial judge (1) impermissibly restricted his efforts to impeach a key Commonwealth witness; (2) admitted in evidence inadmissible hearsay; (3) erroneously failed to define for the jury the word "malice" during his charge; (4) incorrectly instructed the jury on transferred intent; and (5) should have instructed the jury on voluntary manslaughter. Finally, the defendant requests that this court use its power under G. L. c. 278, § 33E, to order a new trial or to direct the entry of a verdict of a lesser degree of guilt. We affirm the judgment.

We summarize the Commonwealth's evidence. On the evening of June 25, 1980, the defendant and his brother, Richard Puleio, arrived at the Pinederosa Bar in Amesbury and found Bonnie Eaton, Richard Puleio's girl friend, socializing with Wayne Subatch and two of Subatch's friends. The defendant spent about thirty to forty-five minutes at the bar and, in that time, had two altercations, during one of which he threatened to "blow [that person's] . . . head right of." Subatch, his friends, and Eaton left the bar, followed closely by the defendant and his brother. An argument ensued, with the defendant and his brother on one side and Subatch on the other. The defendant pulled out a gun, aimed it at Subatch's head, and fired one shot. Subatch ducked. Sharon Ann Snow was standing behind Subatch, and the defendant's bullet struck her in the chest and killed her. The defendant fled from the scene, and the next night a Virginia State trooper arrested him as he was traveling south on Interstate Highway 95. The defendant had shaved his beard and had repainted his motorcycle, and the motorcycle bore a registration plate not assigned to him by the Registry of Motor Vehicles.

The defendant and his witnesses testified, among other things, that Subatch — not the defendant — fired the fatal shot.

1. *Impeachment of Wayne Subatch.* After a conference between the judge and both counsel in which the prosecutor declined to agree to the defendant's introduction of evidence of Subatch's criminal convictions through a probation department form known as a "blue sheet," the judge, with the agreement of counsel, conducted a voir dire examination of Subatch. The purpose of the examination was to determine whether Subatch had been convicted as shown by the blue sheet, and, if so, whether he had been represented by counsel when he had been convicted. Subatch testified that he was the person who had been convicted of several of the offenses listed on the blue sheet. Furthermore, he testified that he had been represented by counsel in connection with some but not all of those convictions. The defendant requested that the judge inquire whether Subatch had waived counsel on the occasions when he was unrepresented, but the judge refused to so inquire.

On the day following that voir dire, during defense counsel's cross-examination of Subatch before the jury, defense counsel requested that the judge suspend the proceedings so that counsel's assistant might obtain certified copies of Subatch's convictions. Counsel had not subpoenaed court personnel with the appropriate records, nor had he procured certified copies of those records. The prosecutor objected that defense counsel had known for several months that the Commonwealth would call Subatch as a witness, and that counsel had had sufficient information to have obtained certified copies of the records prior to trial. The judge refused to suspend the trial, but he expressed his understanding that the prosecutor had agreed the day before that, without offering official records or certified copies, defense counsel could prove those convictions shown on the blue sheet with respect to which Subatch had admitted having representation. Defense counsel proved those convictions but no others.

The defendant argues that by excluding evidence of Subatch's convictions while unrepresented the judge violated the defendant's right to confront the adverse witness and his right to due process of law, rights guaranteed to him by the Sixth and Fourteenth Amendments to the United States Constitution,

by art. 12 of the Declaration of Rights of the Massachusetts Constitution, and by G. L. c. 263, § 5. He argues that the law of the Commonwealth clearly permits him to impeach Subatch with counsel-waived convictions. Furthermore, he argues that because Subatch is a witness — not a defendant — he can impeach Subatch with *any* convictions, even those obtained when Subatch had no counsel and did not waive counsel. The defendant did not present the latter argument below. In any event, we need not consider whether a nonparty witness at a criminal trial may be impeached by convictions obtained when that witness had no counsel, regardless of whether the witness had waived counsel. In order to impeach a witness by a criminal conviction, the conviction must be proved by a court record or a certified copy. *Commonwealth* v. *Atkins*, 386 Mass. 593, 600 (1982). *Commonwealth* v. *Clifford*, 374 Mass. 293, 305 (1978). *Commonwealth* v. *Walsh*, 196 Mass. 369, 369-370 (1907). See G. L. c. 233, § 21. The defendant did not do that, and the judge was not obliged to suspend the trial to allow the defendant to do then what he could have done earlier.

2. *Admission of hearsay evidence.* Jacqueline LaMothe, the bartender, testified that while in the bar she heard a shot and then a scream, and that then someone ran into the bar and told her to telephone for an ambulance. She testified that after making the telephone call she went outside and "asked who had shot the gun once, and nobody answered me." Over the defendant's objection, LaMothe testified that Bonnie Eaton then "yelled out" a response to her inquiry. The defendant again objected, and counsel approached the bench. Defense counsel stated that he based his objection on the rule against hearsay. The prosecutor indicated that she relied on the "spontaneous utterance" exception to that rule. See *Commonwealth* v. *Hampton*, 351 Mass. 447 (1966). The judge allowed the prosecutor to ask LaMothe, "What did Bonnie Eaton say?" LaMothe responded, "Joe Puleio."

"With respect to spontaneous utterances the guiding principles have been stated — and in our view correctly — by Prof. Wigmore: 'The utterance must have been before there has been time to contrive and misrepresent . . . . It is to be observed

that the statements need not be strictly contemporaneous with the exciting cause; they may be subsequent to it, provided there has not been time for the exciting influence to lose its sway and to be dissipated. . . . [T]here can be no definite and fixed limit of time. Each case must depend upon its own circumstances.' Wigmore on Evidence (3d ed.) [1940] § 1750. . . . The trial judge in determining whether an utterance meets the tests of admissibility ought to be given broad discretion. . . . [A]nd only in clear cases . . . of an improper exercise of discretion should his ruling be revised." *Rocco* v. *Boston-Leader, Inc.*, 340 Mass. 195, 196-197 (1960). Those principles apply to criminal, as well as civil, cases. See *Commonwealth* v. *Hampton, supra* at 449.

The defendant argues that LaMothe's testimony that no one initially answered her inquiry about who had fired the gun indicated "that a substantial period of time had elapsed" between LaMothe's question and Eaton's utterance. However, the record does not demonstrate how much time elapsed between the inquiry and the response. We cannot say that the utterance lacked the spontaneity required to meet the test of admissibility. In allowing LaMothe's testimony, the judge did not abuse his discretion.

The defendant also argues that the judge should have excluded the hearsay statement because the Commonwealth presented no evidence that Eaton had observed the shooting. LaMothe testified that just minutes before the shooting Eaton left the bar with Subatch and the two other men. That testimony sufficiently placed Eaton at the scene of the shooting.

3. *Definition of "malice."* In his instructions, the judge defined for the jury murder in the first degree, murder in the second degree, and involuntary manslaughter: "[I]f a defendant has an unexcused intent to injure somebody, not necessarily to kill, but to injure somebody, under such circumstances known to the defendant that common experience shows to present a plain and strong likelihood that death will follow the defendant's contemplated act, and death does result, then that person, that defendant would be guilty of murder in the second degree. That is to say, if there is an intent to injure, under

circumstances when in human experience there is a plain and strong likelihood that the injury will result in death, and death does result, then that is murder in the second degree. If instead of merely intending to injure the person, the defendant intended to kill the person, and death does result, that is the next highest step, that is, murder in the first degree. The difference between murder in the first degree and murder in the second degree is that, with respect to murder in the first degree, there is an intent to kill, whereas with respect to murder in the second degree there is an intent only to injure.

"Now, to deal with the step down from murder in the second degree, namely, involuntarily manslaughter. If there is no intent to injure but the defendant's conduct involves a high degree of likelihood that substantial harm will result to some person; that is, if the defendant disregards the probable harmful consequences to some person and death results, then that is involuntary manslaughter. It is not necessary that the defendant have a given individual in mind."

After giving that general explanation, the judge "[brought] the principles that [he had] been discussing a little closer to this case." He told the jury: "If you are not convinced beyond a reasonable doubt that the defendant fired the pistol, you will return a verdict of not guilty. If you are convinced beyond a reasonable doubt that the defendant fired the pistol *intending to kill Wayne Subatch*, you will return a verdict of guilty of *murder in the first degree*. If you are convinced beyond a reasonable doubt that the defendant fired the pistol *intending to injure Mr. Subatch*, in such circumstances known to the defendant that, according to common experience, there was a plain and strong likelihood that death would follow the firing, then *even though you are not convinced beyond a reasonable doubt that the defendant intended to kill Wayne Subatch, you will return a verdict of guilty of murder in the second degree*. Finally, if you are convinced beyond a reasonable doubt that the defendant fired the pistol not intending to injure Mr. Subatch, but for any other purpose, and you find beyond a reasonable doubt that a reasonable person in the defendant's position would have realized that the firing of the pistol would involve

a high degree of likelihood that the bullet would strike somebody, then you would return a verdict of guilty of manslaughter." The judge also instructed the jury that self-defense was not an issue in the case. The defendant does not contest that instruction.

When the judge finished his charge, the prosecutor requested that the judge further instruct the jury that in order to convict the defendant of murder in the first degree they must find deliberate premeditation. Defense counsel objected, saying "I think that you have given a proper instruction on it." In response to the judge's inquiry whether defense counsel had any objection to the charge as given,[1] counsel said, "Just about that deliberation." Counsel then requested that the judge instruct the jury that "there must be premeditation and malice aforethought." The judge then read to the jury from G. L. c. 277, § 39, which defines murder as "the killing of a human being with malice aforethought," and from G. L. c. 265, § 1, which defines the degrees of murder. The judge also defined for the jury the term "deliberate premeditation." Counsel made no further objections or requests.

The defendant argues that the judge erred by failing to define for the jury the word "malice." We agree that the judge's instructions were erroneous. It was clearly incorrect to say that, to establish murder in the first degree, the Commonwealth had to prove that the defendant intended to kill Subatch. The judge placed too heavy a burden on the Commonwealth. However, as basic as the error was, it was harmless to the defendant beyond a reasonable doubt, and therefore it was not reversible.

Murder in the first degree includes "[m]urder committed with deliberately premeditated malice aforethought . . .." G. L. c. 265, § 1. "Murder is the unlawful killing of a human being with malice aforethought." *Commonwealth* v. *Campbell*,

---

[1] The prosecutor had told the judge that she had no objection to "the charge as given," except for the omission of an instruction concerning deliberate premeditation. According to the transcript, the judge then asked defense counsel if he had any objections to "the *charges* given." It seems clear that the judge asked, "[D]o you have any objections to the charge *as* given?"

375 Mass. 308, 312 (1978). "Malice aforethought includes any unexcused intent to kill, to do grievous bodily harm, or to do an act creating a plain and strong likelihood that death or grievous harm will follow." *Commonwealth* v. *Huot,* 380 Mass. 403, 408 (1980). So, in order to convict a defendant of murder in the first degree, other than felony murder, the Commonwealth must prove that the defendant unjustifiably killed another, and that he intended to kill or to do grievous bodily harm to the victim, or that he intended to do an act creating a plain and strong likelihood that the victim's death or grievous harm would follow. The Commonwealth must also prove that the defendant acted with premeditation, or that the defendant acted with extreme atrocity or cruelty. By using this type of language, a judge can convey to a jury all the elements of the crime of murder in the first degree without using the word "malice." That form of instruction obviates the need to explain to a jury what "malice" does *not* mean.

Had the judge properly instructed the jury, they could have found the defendant guilty of murder in the first degree if they found that the defendant, with deliberate premeditation, intended to kill Subatch, or intended to injure him grievously, or intended to do an act creating a plain and strong likelihood that Subatch would suffer death or grievous bodily harm. But, under the instruction given, the jury could only find the defendant guilty of murder in the first degree if they found that he intended, with deliberate premeditation, to kill Subatch. The judge's instruction erroneously deprived the Commonwealth of the ability to satisfy the mens rea requirement for murder in the first degree by establishing, in addition to deliberate premeditation, an intent to grievously injure Subatch or to act in a way that would create a plain and strong likelihood of his death or grievous bodily harm. The defendant cannot legitimately complain of an error that only could have benefited him. The instruction that the judge gave — that an intent to kill, coupled with deliberate premeditation, could supply the requisite mental element of murder in the first degree — correctly described one possible mental state for murder in the first degree, and the jury's verdict demonstrates that they found that the defendant had that mental state.

Furthermore, as the colloquy between the judge and counsel following the main part of the charge shows, the defendant, understandably, did not object to the instructions on malice. Rather, defense counsel joined the prosecutor in focusing on deliberate premeditation. Because defense counsel did not suggest to the judge any dissatisfaction with the judge's further jury instructions, to obtain a reversal of the conviction on the ground that the jury charge was inadequate, the defendant must demonstrate that the error created a substantial likelihood of a miscarriage of justice. G. L. c. 278, § 33E. *Commonwealth* v. *Roberts*, 378 Mass. 116, 123 (1979). He has not done so. The principal issue at trial was not whether a murder had been committed. Rather, it was whether the murder had been committed by the defendant, as the Commonwealth contended, or by Subatch, as the defendant claimed. Thus, the erroneous instruction on malice did not relate to an actively contested issue, so it did not create a substantial risk of a miscarriage of justice.

4. *The judge's instruction as to transferred intent.* The judge instructed the jury as follows: "The theory of the Commonwealth's case . . . is something called transferred intent. It sounds like a complicated concept, but it is really very simple. If a person intends to harm Smith and goes about harming Smith, but instead of harming Smith harms Jones, the law considers that the person started out to harm Jones. That's all that transferred intent means. If I aim at a person there but hit a person in the other direction, the law assumes that I intended to hit the second person. That is what transferred intent means. *Now, observe that there has to be a proof of intent to injure the first person before we even get to the question of the second person.* But once there has been proved beyond a reasonable doubt an intent to injure person No. 1, the fact that it was person No. 2 who got hurt is immaterial."

The defendant argues that that instruction relieved the Commonwealth of its burden of proving every element of the defendant's crime beyond a reasonable doubt, and therefore violated the principles of *Sandstrom* v. *Montana*, 442 U.S. 510 (1979). We disagree. The judge correctly stated our law of transferred

intent, see *Commonwealth* v. *Ely,* 388 Mass. 69, 76 n.13 (1983); *Commonwealth* v. *Hawkins,* 157 Mass. 551, 553 (1893), by emphasizing the Commonwealth's burden of proving the defendant's intent to injure Subatch, although Snow became the victim. Our law is consistent with the principles enunciated in *Sandstrom, supra.*

5. *Voluntary manslaughter.* The defendant argues that the judge erred by failing to instruct the jury on the theory of voluntary manslaughter. The defendant's trial counsel did not request such an instruction. Citing *Commonwealth* v. *Schnopps,* 383 Mass. 178 (1981), the defendant argues in his brief, that "[t]here was evidence produced at trial upon which the jury could find voluntary manslaughter, — provocation causing the accused to lose his self-control in the heat of passion and a killing which occurred before time for tempers to cool." The defendant points to none of that evidence. None appears in the record.

6. *General Laws c. 278, § 33E.* Finally, the defendant requests that, pursuant to G. L. c. 278, § 33E, this court order a new trial or reduce the verdict to a lesser degree of guilt. "[O]ur power to mitigate verdicts under § 33E is to be used sparingly." *Commonwealth* v. *Watson,* 393 Mass. 297, 301 (1984), quoting *Commonwealth* v. *Dalton,* 385 Mass. 190, 197 (1982). Nothing in the record suggests that the defendant's conviction of murder in the first degree was inappropriate.

*Judgment affirmed.*

NOLAN, J. (dissenting, with whom Liacos, J., joins). A fundamental proposition of our system of criminal justice is that a defendant cannot be convicted of a crime absent a proper instruction to the jury on the elements of the crime with which he stands charged. The duty to instruct properly falls on the trial judge. *Commonwealth* v. *Porter,* 10 Met. 263, 285-286 (1845). An essential element of the crime of murder is proof of malice aforethought. One who kills another, either with the intent to kill or with the intent to injure, is not necessarily

guilty of murder, for there may be factors of excuse, justification, or palliation present. "Malice, in the definition of murder, is imputed to an act done wilfully, *malo animo,* an act wrong in itself, injurious to another, and for which there is no apparent justification or excuse. Such justification or excuse must depend on the existence of facts; and such facts must be proved and found, in order to be the basis of any judicial decision." (Emphasis in original.) *Commonwealth* v. *York,* 9 Met. 93, 104 (1845). See *Commonwealth* v. *Mangum,* 357 Mass. 76, 85 (1970). The court admits that no valid definition of malice aforethought was given; yet it affirms the conviction because it views the erroneous charge as unduly favorable to the defendant. The court misses the point. The point is that nowhere in the charge given was there a valid definition of murder, either in the first or second degree. The fact that the judge instructed on premeditation is irrelevant, since such a factor is only a distinguishing one between the degrees of murder. *Commonwealth* v. *Hicks,* 356 Mass. 442, 444 (1969). Premeditation is not an essential element of the crime of murder; premeditation relates only to the degree of murder. Hence, the jury were given no guidelines to determine the first question: Was there a murder? The question of the degree of murder cannot be addressed until a murder is shown. "This failure to define one of the elements of the offense charged required the jury to speculate in reaching its decision. The jury could not determine, without knowing what malice meant in the context of this case, whether the Commonwealth had carried its burden of establishing the existence of this element beyond a reasonable doubt." *Commonwealth* v. *Niziolek,* 380 Mass. 513, 527 (1980) (malice as a necessary element of the crime of arson). I cannot agree that allowing a jury to speculate on the essential elements of a crime charged is nonprejudicial. Accordingly, I dissent.