## COMMONWEALTH vs. TAFFARI FISHER.

Essex. October 3, 2000. - February 12, 2001.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, & SOSMAN, JJ.

*Homicide. Practice, Criminal,* Required finding, Instructions to jury, Assistance of counsel, Capital case. *Intent. Constitutional Law,* Self-incrimination, Assistance of counsel. *Witness,* Refusal to testify, Unavailability. *Self-Defense.*

Evidence at a murder trial was sufficient to support the jury's verdict of guilty of premeditated murder, relying on the doctrine of transferred intent, and the defendant's motion for a required finding of not guilty was correctly denied. [342-344]

At the trial of a murder case, no substantial likelihood of a miscarriage of justice arose from the judge's instructions on transferred intent. [345-347]

At a murder trial in which an intended victim unexpectedly and without sufficient cause refused to testify after being called to the witness stand and answering some preliminary questions, no substantial likelihood of a miscarriage of justice was created, where the judge struck the testimony and gave the jury appropriate and forceful instructions, where there was no prosecutorial misconduct, and where the witness's refusal to testify did not add "critical weight" to the prosecution's case. [349-352]

Evidence at a murder trial did not warrant instructions to the jury on self-defense or voluntary manslaughter, and there was no error in the judge's refusal so to instruct. [352-353]

At a murder trial, asserted errors of trial counsel in failing to object to the calling of a certain witness, failing to proffer grand jury testimony of a witness who refused to testify, failing to impeach another witness with certain prior inconsistent statements, and failing to file a motion for disclosure of promises, rewards, or inducements did not amount to ineffective assistance of counsel, where they were reasonable tactical decisions or where any error would not have influenced the jury's decision. [353-359]

INDICTMENTS found and returned in the Superior Court Department on February 11, 1998.

The cases were tried before *Robert A. Barton,* J., and a motion for postconviction relief was heard by him.

*John J. Barter (Jean M. Terranova* with him) for the defendant.

*Marcia H. Slingerland,* Assistant District Attorney, for the Commonwealth.

SOSMAN, J. A jury convicted the defendant of murder in the first degree and carrying a firearm without a license. On appeal, the defendant claims that numerous errors at trial warrant the reversal of his convictions and also requests relief pursuant to G. L. c. 278, § 33E. While this appeal was pending, the defendant filed a motion for postconviction relief, which we remanded to the Superior Court for disposition. The trial judge denied the motion, and the defendant's appeal from that order has been consolidated with his direct appeal. We affirm the defendant's convictions and decline to exercise our power under G. L. c. 278, § 33E.

1. *Facts.* We recite the facts in the light most favorable to the Commonwealth, reserving certain details for discussion in conjunction with the issues raised. On October 15, 1997, at approximately 1 A.M., the defendant and his friend, Edward Walker, were at a 7-Eleven store on Essex Street in Lynn. Four other young people, Eric Cruz, Latoya Graham, Tranece Barnes, and Eric Daniels, were also at the 7-Eleven store at the same time. The store's surveillance videotape depicted the defendant staring at Cruz. When Cruz left the store and walked up Essex Street with his three companions, the defendant and Walker followed them. As they proceeded on Essex Street, Cruz was walking in front, with Daniels, Barnes, and Graham walking three abreast just a few feet behind him.

Once they had reached a dark, deserted stretch of the street, beyond the vicinity of the 7-Eleven store, Daniels heard a "clack" noise, which he recognized as the sound of a round being chambered in a semiautomatic weapon. He turned around, but saw nothing behind him except "a dark street." There was a car parked on the side of the street, and the jury could have inferred that the defendant and Walker were hiding behind the car at the time Daniels turned around. A live cartridge was later found on the street near the parked car. A ballistics expert testified that that cartridge came from the defendant's gun, and that, when tested, it failed to fire on three out of eight attempts. After a failed attempt to fire, one would have to pull the slide and reset it to engage the trigger again, a process that would eject the cartridge that had been in place at the time of the failed shot. From this evidence, the jury could have inferred that the defendant had attempted to shoot a round from his position behind the car, that the weapon had failed to fire, and that the defendant had pulled back the slide to chamber another round.

After seeing no one behind him, Daniels turned and resumed walking. The defendant and Walker then came out from their hiding spot behind the car and walked up right behind Daniels. The defendant stepped on the back of Daniels's boot, whereupon Daniels turned around and saw the defendant and Walker about one and one-half feet away. Daniels asked the defendant what he was doing. Walker then told the defendant to give him the "strap," a slang term for gun. The defendant reached into the front of his pants, pulled out a gun, and pointed it at Daniels, inches from his forehead. Daniels then grabbed the gun, and he and the defendant struggled over it for a few seconds. During this brief struggle, the defendant's finger was on the trigger. The defendant "yanked" the gun back, and pulled the trigger. Graham, who was by then a little bit ahead of Daniels and a few feet behind Cruz, was struck in the head by a single bullet. She died at Lynn Hospital shortly thereafter.

The defendant was arrested later that morning. After being advised of his Miranda rights, the defendant made a statement to the police. The defendant stated, "I had a problem with the smaller dude. . . . I had a beef with him over stuff he said."[1] According to the defendant, he followed Cruz out of the 7-Eleven store and down the street. He stated, "What was I going to do, pull the gun out in the store?" He pulled the gun out when he was about three feet from the group, at which point "[t]he taller one [Daniels] turned and grabbed the gun and it went off. I just shot. I did not move the slide first."

2. *Sufficiency of the evidence.* The Commonwealth proceeded on the theory that the defendant had planned and intended to kill Cruz, and relied on the doctrine of transferred intent to prove murder in the first degree for the shooting of Graham. The defendant argues that the evidence was insufficient to prove deliberate premeditation or a specific intent to kill Cruz. We conclude that there was sufficient evidence to support the jury's verdicts.

In reviewing a denial of a motion for a required finding of not guilty, we consider the evidence in the light most favorable to the Commonwealth to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Commonwealth* v. *Cordle*, 412 Mass. 172, 175 (1992). "The relevant question is whether the evidence

---

[1]Cruz was noticeably shorter than Daniels, and the reference to "the smaller dude" was thus a reference to Cruz.

would permit a jury to find guilt, not whether the evidence requires such a finding." *Commonwealth* v. *Lydon*, 413 Mass. 309, 312 (1992). The Commonwealth may rely on inferences drawn from the evidence, so long as those inferences are "reasonable and possible." *Id.* "To the extent that conflicting inferences are possible from the evidence, 'it is for the jury to determine where the truth lies.' " *Id.*, quoting *Commonwealth* v. *Martino*, 412 Mass. 267, 272 (1992).

The Commonwealth presented evidence that the defendant had a "problem" with Cruz and "had a beef with him over stuff he said." When the defendant met Cruz by chance in the 7-Eleven store, he stared at him and then followed him out of the store. The defendant later acknowledged that he was armed at the time and, from his reference to the gun ("What was I going to do, pull the gun out in the store?"), the jury could infer that the defendant's initial thought of using the gun on Cruz occurred while they were still in the store and that the defendant followed Cruz seeking a better opportunity to attack him. From Daniels's testimony about hearing the sound of a round being chambered, combined with the discovery of a live cartridge on the street near the parked car, expert testimony that the cartridge was from the defendant's gun, and tests showing that the defendant's gun would regularly misfire, the jury could have concluded that the defendant had tried to shoot from his hiding place behind the car but that the gun had misfired. Following that failed attempt, the defendant then approached the group and pulled out his gun again, ready to fire (the safety off and a round already chambered), as he reached Daniels. The jury could have concluded that the defendant approached the group to get a closer shot at Cruz, but that Daniels stood in his way. The defendant pointed the weapon at Daniels, and, after Daniels grabbed the gun, the defendant "yanked" the gun back and "just shot" in the direction of Cruz.[2] From this evidence, the jury could conclude that Cruz was the defendant's intended victim, and that there had been a period of premeditation, from

[2]The expert had testified that the defendant's gun did not have a "hair trigger," and that, from the placement of hands on the weapon and the motions described in the defendant's struggle with Daniels, the gun would not have gone off because of anything Daniels was doing with the gun. The gun itself (unloaded) was in evidence, and the prosecutor's closing argument invited the jurors to see for themselves how much force it took to pull the trigger: "I invite you . . . when you have the gun in the jury room, you try to pull on this thing. This thing is not easy to pull. It is stiff."

the encounter in the 7-Eleven store through the misfired shot behind the car, the confrontation with Daniels, and the ultimate firing of the weapon.

The defense also argues that, even if the jury could have found that the defendant had a premeditated intent to kill Cruz, the evidence was insufficient to show that the defendant had that intent at the precise moment the gun was fired. Specifically, he argues that, where the gun went off during the struggle with Daniels, it was unreasonable to infer that the defendant was aiming purposefully at Cruz at the time the gun was fired.

While the evidence concerning the struggle certainly raised the issue of accident and involuntary manslaughter,[3] it did not prevent the jury from concluding that the shooting was intentional and that it was directed at Cruz. As discussed above, there was evidence that an intent to kill Cruz, and a plan to carry out that killing, had been formulated earlier. When the defendant confronted Daniels and Daniels grabbed the gun, the gun was already set to fire and the defendant's finger was on the trigger. After just a few seconds' struggle with Daniels, the defendant "yanked" the gun backward, and, as discussed above, the jury could conclude that the pulling of the trigger was not caused by any motion Daniels was making. The defendant's own characterization of what happened ("I just shot") is consistent with a purposeful firing of the weapon. The jury were also entitled to consider the direction the bullet was fired, which, in order to have hit Graham, was toward Cruz. The jury could conclude that the defendant was indeed aiming at Cruz but that, firing quickly and under pressure before Daniels could get the gun away from him, his aim was somewhat compromised, causing the bullet to hit Graham instead of Cruz.[4,5] The defendant's motions for a required finding of not guilty were properly denied.

---

[3]The judge correctly instructed the jury on accident and involuntary manslaughter.

[4]This was the Commonwealth's theory as articulated in closing argument. The defendant was intending to kill Cruz, but "Daniels'[s] intervention . . . redirects that bullet."

[5]The Commonwealth argues in the alternative that, even if there was insufficient evidence to show that the defendant had the intent to kill Cruz at the time he fired the gun, there was sufficient evidence to show that he intended to kill Daniels at that time. The gun had just been held at Daniels's head at point blank range and, when fired, made Daniels think initially that he had been hit. The defendant contends that the Commonwealth did not try the case under the theory that the defendant intended to kill Daniels and that the Com-

3. *Instruction on transferred intent.* On appeal, the defendant argues that the judge's instruction on transferred intent was deficient. Defense counsel did not object to the instruction when given and, in fact, specifically asked the judge to refrain from including the language that he now says should have been included. Therefore, we review whether any error in the instruction caused a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Drumgold*, 423 Mass. 230, 258 (1996), and cases cited.

The judge gave the following instruction on transferred intent: "When a person is killed who was not the person intended and if the intended victim had died and his death would be murder in the first or second degree, then the unintended killing of a bystander from any act directed at the person intended to be killed is criminal homicide of the same degree if proved by the Commonwealth beyond a reasonable doubt."

The defendant argues that this instruction was erroneous because it did not make any reference to pointing, aiming, or pulling the trigger of a gun; therefore, the defendant contends, it reduced the Commonwealth's burden of proof on the element

---

monwealth should not be allowed to present this alternative theory on appeal. Although the Commonwealth's theory was that Cruz was the intended victim, the Commonwealth did articulate the view that the defendant was also prepared to kill anyone who prevented him from getting at Cruz. In his opening statement, the prosecutor explained that the defendant's "intent was to kill Eric Cruz or anyone else that got in his way when that shot was fired into Latoya Graham's head." In closing, the prosecutor again argued that the defendant's ultimate goal was to kill Cruz, "[a]nd if someone else is going to step in the way, that gun is going right at their head. I suggest to you that if Eric Daniels doesn't grab that gun and push it to the side that bullet could have just as easily gone through his head and, indeed, you know how close it came because Eric Daniels says: 'I thought I got shot.' " The evidence would support the conclusion that the defendant had planned to murder Cruz and that, when Daniels blocked his way and tried to grab the gun away from him, he fired at Daniels intending to kill him first. The bullet narrowly missed Daniels and hit Graham. The judge's instruction on transferred intent did not identify the name of the intended victim, and the defendant did not object to that instruction. To find murder based on a theory of transferred intent, the jury need only find that the defendant "intended to kill one person and, in the course of an attempt to do so, killed another." *Commonwealth* v. *Pitts*, 403 Mass. 665, 669 (1989). The Commonwealth does not have to prove the identity of the intended victim. *Id.* at 668-669. Other jurisdictions have also held that the prosecution does not have to prove the identity of the intended victim, nor does the name of the intended victim need to be identified in the transferred intent jury instruction. See, e.g., *Ewell* v. *State*, 105 Nev. 897, 899 (1989); *State* v. *Davis*, 349 N.C. 1, 37-38 (1998), cert. denied, 526 U.S. 1161 (1999).

of intent. We disagree. Although we have approved instructions on transferred intent in the past that used references to pointing or aiming a gun, we have not required that such language be included in the instruction. See *Commonwealth* v. *Drumgold, supra* at 259; *Commonwealth* v. *Pitts,* 403 Mass. 665, 669 & n.6 (1989); *Commonwealth* v. *Puleio,* 394 Mass. 101, 109-110 (1985). Rather, in each of the instructions we approved, there was other language explaining the law of transferred intent, and the references to aiming or pointing a gun at one person with the bullet then hitting someone else were given as hypothetical illustrations of the application of transferred intent. See *Commonwealth* v. *Drumgold, supra; Commonwealth* v. *Puleio, supra.*

In the present case, defense counsel specifically requested that the judge refrain from using any example that referred to pointing or aiming. Where the defendant's theory was that the gun had gone off by accident during a struggle, and that he had not aimed or pointed the gun at anyone prior to its discharge, defense counsel understandably did not want the judge to give an example of aiming or pointing a gun as an illustration of the doctrine of transferred intent. Hypothetical examples that illustrate a legal doctrine can be very useful to the jury, but, as defense counsel appreciated, they can sway the jury if the specifics of the illustration are virtually identical to one party's version of the facts of the case. To avoid that potential prejudice, the judge complied with defense counsel's request and explained the law of transferred intent without providing an illustrative example.

The substance of the judge's explanation of transferred intent was consistent with instructions we have approved. In both the *Drumgold* and *Puleio* cases, we approved instructions explaining that if a defendant intends to harm a person, "goes about harming" that person, but harms another person instead, the doctrine of transferred intent would apply. See *Commonwealth* v. *Drumgold, supra; Commonwealth* v. *Puleio, supra.* In this case, the instruction given was, if anything, more favorable to the defendant. The judge instructed that the jury must find that the victim was killed by an "act directed at the person intended to be killed" in order to convict the defendant. Without using examples involving pointing or aiming, the judge's explanation that the unintended victim must be harmed by an "act directed at" the intended victim conveyed the same sense that the killing

of the unintended victim must be the product of the defendant's actual perpetration of the crime against the intended victim.[6]

4. *Refusal of Eric Cruz to testify.* Eric Cruz, the intended victim, testified at the probable cause hearing. He answered all of the questions asked by both the prosecutor and defense counsel, and he did not assert any privileges at that time. Most of that testimony paralleled the testimony of the other witnesses the Commonwealth presented at trial. Cruz, walking slightly ahead of the others, had not seen or heard any of the confrontation between the defendant and Daniels. He had heard what he described as a "chi chi" sound, which he recognized as coming from an automatic weapon, and the gun fired immediately after he heard that sound. Cruz had volunteered the opinion that, from the short interval between the mechanical sound and the gun's going off, "it could have sounded like the gun went off by accident." Cruz had started running the instant he heard the sound, and he did not see the actual firing of the gun, nor did

---

[6]The defendant also argues that the prosecutor's closing argument improperly commented on and mischaracterized the law of transferred intent. There was no objection to the closing, and thus we consider only whether any error in the prosecutor's remarks on the subject of transferred intent created a substantial likelihood of a miscarriage of justice. The prosecutor argued in closing, "[N]o one here is saying that the defendant intended to kill Latoya Graham, and that's where we get into this whole notion of transferred intent. What we are saying here . . . and the judge will instruct you on the law on this — is that if the defendant went out with the intent to kill Eric Cruz, took steps in that direction but ended up killing Latoya Graham, then legally he intended to kill Latoya Graham." The defendant contends that applying transferred intent to a death that occurred while a defendant was merely taking unidentified "steps" toward the intended killing of someone else would improperly extend the doctrine to fact patterns such as an automobile accident occurring on the way to a planned murder. However, the prosecutor told the jury that the judge would instruct them on the law later, thereby advising the jury not to place emphasis on his version of the law. See *Commonwealth* v. *Atkins*, 386 Mass. 593, 602 (1982). Nor could the facts of this case be confused with the kind of hypothetical now proffered by the defendant. The judge instructed the jury that the Commonwealth had to prove that the firing of the gun was not an accident, and the jury thus understood that they could only convict the defendant if he had intentionally fired the weapon. Finally, the judge's correct explanation of transferred intent was repeated twice, and a transcript of the judge's charge was sent into the jury room during deliberations. There is no substantial likelihood that the jury substituted counsel's one reference to a defendant taking "steps" toward a planned killing for the judge's repeated oral and written charge on the subject, nor any substantial likelihood that the jury's verdict was affected by this solitary reference.

he even know who had been hit. He did testify about prior confrontations with Walker, but claimed that, on seeing Walker in the 7-Eleven store, they had shaken hands.

However, between the time of Cruz's probable cause testimony and the date of trial, Cruz had been incarcerated on a drug charge. On the first day of trial, prior to opening statements, the Commonwealth alerted the judge and defense counsel that Cruz was then saying that he was not going to testify at trial. The prosecutor explained that Cruz's refusal to testify was not based on any invocation of his rights under the Fifth Amendment to the United States Constitution. Rather, the Commonwealth represented that Cruz's refusal was based on the fact that he was incarcerated and that he now did not want to "rat on anybody." The judge inquired of defense counsel, noting that it might be to the defendant's benefit to have Cruz testify. Defense counsel agreed that "[i]t may very well be," and made no objection to the prosecutor's calling Cruz to the stand.

Cruz took the stand and answered a few preliminary questions identifying himself. He confirmed that he was presently serving a sentence on a drug charge. When asked if he remembered the night of October 14 into the early morning of October 15, 1997, he answered, "Nope." On further questioning, he acknowledged that he had been with Daniels, Graham, and Barnes at the 7-Eleven store that night. When asked whether he remembered anything unusual occurring that night, he again answered, "Nope." Cruz then asked to know the name of the prosecutor and, as the judge was answering him, Cruz interrupted with, "I'm not answering no more questions."

The judge immediately excused the jury for a recess and, outside the jury's presence, asked Cruz why he was refusing to testify. Cruz responded: "There is nobody here for me. None of my family is here and nobody I know. I don't feel comfortable." The judge warned him that, absent "a constitutional right to refuse to answer," he would have to answer or be held in contempt. Cruz still refused to testify, whereupon the judge held him in contempt and sentenced him to ninety days from and after the sentence he was already serving.[7] When the jury returned, the judge struck Cruz's testimony from the record and

---

[7]The judge later vacated the contempt order because Cruz had not been advised of his right to counsel on the matter.

gave the jury a curative instruction.[8] The judge also invited defense counsel to submit a further jury instruction on the subject, and he gave defense counsel's proposed instruction verbatim as part of his final charge to the jury.[9]

The defendant now contends that the jury's observation of Cruz's refusal to testify was the equivalent of Cruz's invoking his Fifth Amendment privilege before the jury.[10] See *United States* v. *Harper*, 579 F.2d 1235, 1240 (10th Cir.), cert. denied, 439 U.S. 968 (1978). We need not decide whether all refusals to testify should be treated as the equivalent of refusing to testify on Fifth Amendment grounds,[11] because we find that, even if the witness in this case had asserted his Fifth Amendment

---

[8]The judge gave the following instruction: "Eric Cruz is not going to testify in this particular case. What I am telling you now is you are going to strike everything that he has said, if anything, from your memory and you are not to consider it in this particular case. There is a basic theory in the law that if defense counsel is not afforded an opportunity to cross-examine, even on what little you hear[d], then that's not an adequate opportunity as far as protection of people's rights are concerned. So, with that in mind — and you heard the young man say that he is not going to testify any further — everything that he said is to be stricken and you put his testimony, if anything, completely out of your mind and just disregard the facts that relate to Eric Cruz."

[9]The instruction was as follows: "Now I want to discuss with you for just a moment the Cruz testimony, if you will. During this trial Mr. Eric Cruz took the witness stand and after answering a series of questions he refused to continue his testimony before this Court. Since Mr. Cruz was not subjected to cross-examination by counsel for [the defendant], I have instructed you to strike from your minds any testimony Mr. Cruz did offer in this courtroom. You are instructed not to speculate at all about the appearance of Mr. Cruz before this Court."

[10]The defendant also suggests that Cruz had a valid basis for asserting his Fifth Amendment privilege, and that, had he been advised by counsel, he would have chosen to assert his Fifth Amendment privilege rather than be subject to a jail sentence for contempt. Whether or not Cruz had a valid basis for asserting his Fifth Amendment privilege, he did not assert such a privilege in front of the jury. All the jury heard was Cruz being somewhat evasive in answering some preliminary questions (i.e., claiming not to remember the incident) and then stating that he would not answer any more questions. The issue on this appeal is whether there was any error based on what the jury did hear Cruz say, not whether there would have been error if Cruz had said something else.

[11]A witness's invocation of the Fifth Amendment in front of the jury is prejudicial in part because of its implication of criminality which, particularly if coming from an accomplice of the defendant, will strongly suggest that the defendant is also a criminal. See *Commonwealth* v. *Martin*, 372 Mass. 412, 413-414 (1977). Depending on what a witness says, a refusal to testify that makes no reference to the Fifth Amendment or self-incrimination would not

privilege before the jury, there would be no substantial likelihood of a miscarriage of justice.

When it is clear that a witness intends to exercise the privilege against self-incrimination, the witness should not be permitted to do so before the jury. *Commonwealth* v. *Hesketh*, 386 Mass. 153, 158 (1982). *Commonwealth* v. *Labbe*, 6 Mass. App. Ct. 73, 79 (1978). Where there is some advance warning that a witness might refuse to testify, the trial judge should conduct a voir dire of the witness, outside the presence of the jury, to ascertain whether the witness will assert some privilege or otherwise refuse to answer questions.[12] That precaution was not taken in this case, and the jury thus heard Cruz's refusal to answer questions. However, reversal is not required in every case where the jury hear a witness assert some privilege or refuse to testify. *Commonwealth* v. *Kane*, 388 Mass. 128, 138 (1983). *Commonwealth* v. *Martin*, 372 Mass. 412, 414 (1977). Rather, when a witness refuses to answer questions in front of the jury, "[t]he inquiry is (1) whether the prosecutor has so unfairly exploited the matter as to constitute prosecutorial misconduct, and (2) whether inferences from the witness's refusal to answer may have added critical weight to the prosecution's case." *Commonwealth* v. *Kane*, *supra*. See *Commonwealth* v. *Martin*, *supra*.

Neither factor is at issue in the present case. There was no prosecutorial misconduct in calling Cruz to testify. In this context, prosecutorial misconduct occurs when the prosecutor "question[s] a material witness in order to provoke a claim of privilege with a deliberate design to raise improper inferences in the minds of the jury." *Id.* Here, Cruz had testified at the probable cause hearing without asserting any privileges or otherwise refusing to answer any questions. When Cruz signaled, immediately prior to trial, that he was then reluctant to testify, the prosecutor brought that fact to the attention of the judge and defense counsel. He did not exploit the situation or conceal the problem. It was, at that time, unclear whether Cruz would refuse to answer any questions outright or whether he

necessarily carry the same stigma. The question is whether, from the witness's refusal, the jury would potentially draw some inference adverse to the defendant. See, e.g., *Commonwealth* v. *Kane*, 388 Mass. 128, 135-139 (1983) (priest's refusal to answer questions about what defendant told him might lead jury to infer that defendant had inculpated himself).

[12]Where it appears that the witness may have some valid privilege, counsel should be appointed to advise the witness with respect to any applicable privileges.

would simply be an extremely uncooperative witness. As the prosecutor explained, he might have to "force[] [the prior testimony] down his throat in some ways." That Cruz might refuse to testify outright, or might be a reluctant witness whose responses were entirely unpredictable, was fully disclosed prior to trial. Presumably because there were some aspects of Cruz's probable cause testimony that were potentially helpful to the defendant, and because a reluctant (and unsympathetic) victim witness might generally weaken the Commonwealth's case, defense counsel opted to run whatever risks there were in having such an uncooperative witness take the stand. That Cruz ultimately refused to testify cannot now be transformed into prosecutorial misconduct.

Nor did Cruz's refusal to testify add "critical weight" to the Commonwealth's case. In front of the jury, Cruz did not give any reason for his refusal, let alone a reason that would have assisted the Commonwealth. He was not a witness associated or affiliated with the defendant, but was instead identified in the evidence as a potential enemy of the defendant. Thus, whatever negative impressions the jury had of Cruz, they did not tarnish the defendant. Prior to expressing his refusal to testify, the jury heard that Cruz was presently serving a jail sentence on a drug charge, and they heard his acknowledgment, albeit a reluctant one, that he had been with the others at the 7-Eleven store in the early morning hours of October 15. At most, they might infer that, as an inmate, Cruz was reluctant to participate in any criminal prosecution.[13] From the evidence presented through other witnesses, the jury learned that Cruz himself was walking up ahead and would not have been in a position to see the interaction between Daniels and the defendant at the time the shot was fired. Daniels, not Cruz, was the percipient witness to the critical events, and the jury would not have been swayed by whatever minimal impressions they gleaned about Cruz from his evasive answers and his ultimate refusal to testify. The prosecutor's opening statement had not included any factual detail that was to have been provided by Cruz, and the prosecutor's closing made no reference to Cruz's refusal to

[13]The prosecutor's opening statement had described Cruz as "somewhat uncooperative" during the investigation and predicted that Cruz would have the same "attitude" when he testified. The prosecutor ascribed Cruz's reluctance to participate with the single phrase, "He is not going to be a rat . . . ."

testify. Cf. *Commonwealth* v. *Martin, supra* at 421-422 (witness's invocation of Fifth Amendment before jury did not add critical weight to prosecution case, even though witness's anticipated testimony had been described in detail in opening statement, where questions put to witness were not themselves "fact laden" and prosecutor's closing did not refer to witness's refusal to testify). Furthermore, the judge struck Cruz's entire testimony from the record and gave two forceful instructions on the subject, one immediately following Cruz's refusal to testify and another as part of the final charge. Cruz's refusal to testify "could not have made the difference between acquittal and conviction." *Id.* at 422.

5. *Failure to instruct on self-defense and voluntary manslaughter.* The defendant next contends that the judge erred in refusing to instruct the jury on self-defense and voluntary manslaughter. We reject these claims because the evidence, viewed in the light most favorable to the defendant, did not warrant the requested instructions. *Commonwealth* v. *Pike,* 428 Mass. 393, 395 (1998).

"If deadly force is used, a self-defense instruction must be given only if the evidence permits at least a reasonable doubt that the defendant reasonably and actually believed that he was in imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force." *Commonwealth* v. *Hart,* 428 Mass. 614, 615 (1999). *Commonwealth* v. *Pike, supra. Commonwealth* v. *Reed,* 427 Mass. 100, 102-103 (1998). *Commonwealth* v. *Harrington,* 379 Mass. 446, 450 (1980). A defendant must use all proper means to avoid physical combat prior to resorting to deadly force. *Commonwealth* v. *Reed, supra. Commonwealth* v. *Hart, supra.* "[T]he right of self-defense ordinarily cannot be claimed by a person who provokes or initiates an assault unless that person withdraws in good faith from the conflict and announces his intention to retire" (emphasis omitted). *Commonwealth* v. *Naylor,* 407 Mass. 333, 335 (1990), quoting *Commonwealth* v. *Maguire,* 375 Mass. 768, 772 (1978).

To support his request for a self-defense instruction, the defendant points only to testimony that, at the time the defendant drew the gun, Daniels's hands were "[c]losed" in front of him "as if he were going to use them to strike" the

defendant.[14] There was no evidence to show that, from this stance of Daniels alone, the defendant reasonably feared for his life. There was no evidence that Daniels was armed or that the defendant believed he was armed. To the extent that Daniels's posture signaled a possible fistfight, the defendant had Walker at his side and had Daniels outnumbered. The defendant could not have reasonably believed that he was in imminent danger of death or serious bodily harm from Daniels.[15]

Moreover, the defendant had provoked the confrontation by deliberately stepping on the back of Daniels's boot. "[S]elf-defense is unavailable to the person who initiates the fray." *Commonwealth* v. *Carrion*, 407 Mass. 263, 268 (1990). The defendant had initiated this particular "fray," and he made no effort to withdraw or announce his desire to withdraw before he pulled out the gun.[16]

Therefore, the right of self-defense never arose, and there was no error in denying the defendant's request for a self-defense instruction. Where the defendant was not entitled to an instruction on self-defense, an instruction on voluntary manslaughter based on the use of excessive force in self-defense was also not required. *Id.*

6. *Ineffective assistance of counsel.* The defendant claims that trial counsel was ineffective in the following respects: failing to object to Eric Cruz's being called as a witness; failing to offer Cruz's probable cause testimony; failing to impeach Daniels with certain prior inconsistent statements; and failing to file a motion for disclosure of promises, inducements, and rewards.

In evaluating a defendant's claim of ineffective assistance of

[14]This detail was contained in Daniels's testimony. The defendant's own statement indicated that he drew the weapon before Daniels had even turned around, and contained no reference (express or implied) to any theory of self-defense.

[15]The defendant also argues that defense counsel was ineffective for failing to impeach Daniels with his earlier statement that he had "pushed" the defendant after the defendant stepped on the back of his boot. This argument is without merit. Even if, on such impeachment, Daniels had acknowledged pushing the defendant, a push by Daniels would not have caused the defendant reasonably to fear that he was in imminent danger of death or serious bodily harm.

[16]Nor could the struggle with the gun give rise to a valid claim of self-defense on the defendant's part. It was the defendant who had introduced deadly force into the combat that he had started and, once he did so, it was Daniels who had the right to defend himself with deadly force, not the defendant.

counsel in a capital case, we consider whether there was error in the course of the trial and, if so, whether that error was likely to have influenced the jury's decision. *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992). When the claimed error is one involving the attorney's strategic decisions, we give due deference to trial counsel's tactical decisions and do not find ineffectiveness unless those decisions were "manifestly unreasonable when made." *Commonwealth* v. *Coonan*, 428 Mass. 823, 827 (1999), quoting *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998). See *Commonwealth* v. *Iglesias*, 426 Mass. 574, 580 (1998). We also recognize that, "[t]hroughout the course of a trial, defense counsel is called on to make numerous tactical decisions," and therefore, "[a] list of subjective critiques of defense counsel's decisions, absent a showing that errors likely affected the jury's conclusions, is insufficient to support an ineffective assistance claim." *Commonwealth* v. *Scott*, 428 Mass. 362, 369 (1998). We conclude that there was nothing manifestly unreasonable about trial counsel's tactical decisions and no error that was likely to influence the jury's conclusion.

(a) *Failure to object to Eric Cruz's being called as a witness.* The defendant argues that his trial counsel erred in failing to object to Eric Cruz's being called as a witness after the Commonwealth informed the court that Cruz was reluctant to testify. There was, as the judge noted at the time, potential benefit to the defense in having Cruz testify. Based on his probable cause testimony, it was reasonable to expect that, if he did testify at trial, Cruz would offer at least some testimony helpful to the defense. More importantly, to the extent that Cruz, the purported intended victim, was now reluctant to cooperate with the prosecution, there was the distinct possibility that Cruz's trial testimony might be tilted even more in favor of the defense or that, at least, an uncooperative victim witness might give the jury an over-all unfavorable impression of the Commonwealth's case. There was nothing manifestly unreasonable in counsel's decision not to object to Cruz's being called as a prosecution witness. Finally, as discussed *supra* at 349-350, there was no substantial likelihood of a miscarriage of justice resulting from Cruz's taking the stand or from Cruz's refusal to testify in front of the jury.

(b) *Failure to introduce Cruz's probable cause testimony.* The defendant argues that defense counsel was ineffective in failing to offer Cruz's probable cause testimony once Cruz

refused to testify. In order to make out a claim of ineffective assistance based on this alleged error, the defendant would first have to establish that Cruz's probable cause hearing testimony would have been admissible. The prior recorded testimony exception to the hearsay rule applies "where the prior testimony was given by a person, now unavailable, in a proceeding addressed to substantially the same issues as in the current proceeding, with reasonable opportunity and similar motivation on the prior occasion for cross-examination of the declarant by the party against whom the testimony is now being offered." *Commonwealth* v. *Trigones*, 397 Mass. 633, 638 (1986), quoting *Commonwealth* v. *Meech*, 380 Mass. 490, 494 (1980).

It is unclear on this record whether Cruz was truly "unavailable." We have held that a witness is unavailable if the witness makes a valid claim of privilege, *Commonwealth* v. *Galloway*, 404 Mass. 204, 208 (1989), but Cruz had not invoked any privilege as the basis for his refusal to testify for the Commonwealth. While the defendant claims that Cruz had a valid claim of privilege that he would have asserted had counsel been appointed to advise him, this argument is speculative. Cruz did not assert his Fifth Amendment privilege at trial, nor had he asserted the privilege at the probable cause hearing. Furthermore, there is no indication that the reason Cruz chose not to testify was in any way related to a fear of incriminating himself.

What Cruz did do at trial was refuse to testify, and the judge's order that he testify and the imposition of sanctions for contempt did not change Cruz's mind.[17] While Proposed Mass. R. Evid. 804 (a) (2) would treat a witness as "unavailable" if the witness "persists in refusing to testify concerning the subject matter of his statement despite an order of the court to do so," we have not yet adopted this proposed rule. To date, we have treated as "unavailable" those witnesses who are dead, ill, or missing (despite good faith efforts to locate them), or who have asserted a valid privilege. See *Commonwealth* v. *Bohannon*, 385 Mass. 733, 742-746 (1982); *Commonwealth* v. *Canon*, 373 Mass. 494,

---

[17]There is no showing that Cruz would have persisted in refusing to testify if he had been asked to testify by the defense (as opposed to the prosecution). Rather, Cruz's refusal to testify apparently stemmed from the fact that he was incarcerated at the time of trial, and was reluctant to appear as a prosecution witness. This was the precise sentiment that Cruz had communicated to the prosecutor before trial, i.e., an unwillingness to "rat" on anybody while he was incarcerated.

499-500 (1977), cert. denied, 435 U.S. 933 (1978); *Commonwealth* v. *DiPietro*, 373 Mass. 369, 380-386 (1977). "We do not, however, equate a refusal to testify, for example, with that measure of necessity which we have held permits the use of prior testimony." *Opinion of the Justices*, 406 Mass. 1201, 1211 (1989).

Assuming, without deciding, that Cruz's probable cause testimony could have been admitted based on his "unavailability," the defendant has not shown that the admission of Cruz's probable cause testimony would likely have affected the jury's decision. The defendant contends that there were two items in Cruz's probable cause testimony that would have been useful to the defense. First, Cruz testified that he had heard the mechanical "chi chi" sound of an automatic weapon immediately prior to the fatal shot, suggesting that the round was chambered as a result of the defendant and Daniels's grappling with the gun. Although potentially helpful to the defendant,[18] this aspect of Cruz's probable cause testimony was cumulative of that of Daniels and Barnes.[19] Barnes testified that she heard a "clicking noise" right before her ears began ringing from the sound of the gunshot, and Daniels testified that he "heard the gun click again and then it fired." There was no dispute about this point (and indeed the prosecutor's opening statement had told the jury that Barnes had heard "a click and a boom"), and there is no reason to believe that Cruz's cumulative testimony on an undisputed detail would have had any effect on the jury's decision.

The other aspect of Cruz's testimony that the defendant contends would have been helpful was that Cruz himself had recognized only Walker in the 7-Eleven store and had not given any indication that he knew or recognized the defendant.[20]

The defendant argues that this information would weaken the

---

[18]The defendant advanced the theory that the live cartridge had been ejected due to the slide going back and forth during the struggle over the gun. However, only a spent casing had been found in the area where the two had struggled over the gun. The live cartridge had been found approximately fourteen feet away in the area of the parked car.

[19]Cruz's opinion that the lack of any delay between the "chi chi" sound and the gunshot meant that the gun "could have" gone off "by accident" would presumably have been excluded as improper lay opinion on an ultimate issue.

[20]This portion of Cruz's probable cause testimony was inextricably

Commonwealth's theory as to motive and intent, as the defendant would have little reason to kill a person he did not even know. However, the defendant's own statement acknowledged that he recognized Cruz, knew who he was, "had a problem" with him, and "had a beef with him over stuff he said." Thus, whether Cruz himself recognized the defendant at the 7-Eleven store would not change the fact that the defendant certainly knew who Cruz was and admitted having some unspecified grudge against him. Cruz's nonrecognition of the defendant would have had no effect on the jury's assessment.

(c) *Failure to impeach Daniels with prior inconsistent statements.* The defendant also argues that defense counsel was ineffective in failing to impeach Daniels with certain prior inconsistent statements. Generally, failure to impeach a witness does not amount to ineffective assistance of counsel. See *Commonwealth* v. *Bart B.*, 424 Mass. 911, 916 (1997), and cases cited. Even on the more favorable standard of review under § 33E, a claim of ineffective assistance based on failure to use particular impeachment methods is difficult to establish. Impeachment of a witness is, by its very nature, fraught with a host of strategic considerations, to which we will, even on § 33E review, still show deference.[21] Furthermore, absent counsel's failure to pursue some obviously powerful form of impeachment available at trial, it is speculative to conclude that a different approach to impeachment would likely have affected the jury's conclusion.

Here, Daniels was subjected to extensive impeachment based on his criminal record and based on various changes in the different versions of events he had given. That defense counsel did not pursue additional avenues of impeachment does not constitute ineffective assistance. See *Commonwealth* v. *Mitchell*, 428 Mass. 852, 854-856 (1999), and cases cited.

(d) *Failure to file a motion for disclosure of promises, induce-*

interwoven with his testimony about his prior confrontations with Walker. Defense counsel had moved in limine to exclude all evidence concerning prior hostilities between Cruz and Walker because there was no showing that the defendant had been involved in or was aware of those prior events, and the judge had allowed that motion without prejudice. Any introduction of Cruz's probable cause testimony concerning his recognition of Walker in the store, and by implication his failure to recognize the defendant, would have reopened the door to the very matter that defense counsel had successfully excluded.

[21]Here, impeachment of Daniels had to be handled with particular care, as a portion of Daniels's testimony (i.e., his version of the struggle with the gun) was a critical component of the defense.

*ments, and rewards.* The defendant next complains that his counsel erred because he failed to file a discovery motion for disclosure of promises, inducements, and rewards. However, defense counsel had moved for discovery of exculpatory evidence, and "[t]he existence of 'any understanding or agreement between the government and a key government witness' is exculpatory evidence which must be revealed to the defendant, provided it is 'material.' " *Commonwealth* v. *Collins,* 386 Mass. 1, 8-9 (1982), quoting *Commonwealth* v. *Gilday,* 382 Mass. 166, 175 (1980).

The defendant has not shown that there were promises, inducements, or rewards given to any Commonwealth witness. Contrast *Commonwealth* v. *Hill,* 432 Mass. 704, 711-717 (2000). The defendant hypothesizes that, because Daniels had a significant criminal record and exposure to criminal charges as a result of the events during the night of the shooting,[22] it is likely that he was provided with some incentive for his testimony.[23] In support of his suspicion that there must have been undisclosed promises, inducements, or rewards given to Daniels, the defendant points to Daniels's acknowledgment that he did not tell the whole story about the incident until after he had spoken with an "Assistant Attorney General with the Suffolk County District Attorney's Office."[24] However, the statement Daniels gave to the police after he spoke with someone at the district attorney's office was more favorable to the defendant than the first statement he had given the police on the night of the shooting, and it was not until that second statement that Daniels acknowledged any form of struggle over the gun.[25] There is no reason to believe that promises, inducements, or rewards were provided to Daniels to obtain his cooperation where, after his discussion with a prosecutor, Daniels actually

[22]Daniels had been incarcerated again in November, 1997, one month after the shooting. That sentence had been imposed on a violation of probation, which was itself based on new offenses. Daniels was still incarcerated at the time of trial.

[23]The defendant makes the same claim as to Cruz. Where Cruz ultimately refused to testify, it is immaterial whether the Commonwealth had (unsuccessfully) sought his cooperation by means of any promises or inducements.

[24]Daniels had had prior dealings with this particular prosecutor in a case where Daniels had been the victim of a shooting.

[25]Absent Daniels's testimony to this effect, the only evidence of any struggle would have been the defendant's assertion, in his statement to the police, that Daniels had "grabbed" the gun.

changed his version of events to one that was far less helpful to the Commonwealth and, in many respects, very favorable to the defendant. Where the defendant has shown nothing to suggest that any Commonwealth witness was in fact promised something in return for testimony, we cannot find ineffective assistance of counsel arising out of defense counsel's reliance on his motion for discovery of exculpatory evidence (instead of a specific motion for promises, inducements, or rewards).

7. *G. L. c. 278, § 33E.* We have reviewed the entire record of the defendant's trial pursuant to G. L. c. 278, § 33E, and we see no reason to exercise our authority to reduce the jury's verdict or order a new trial.

*Judgments affirmed.*

*Order denying motion for post-conviction relief affirmed.*